**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEX GARNETT, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 21-cv-5125-PAE |
| v. | |
| RLX TECHNOLOGY INC., YING (KATE) WANG, LONG (DAVID) JIANG, YILONG WEN, YUEDUO (RACHEL) ZHANG, COLLEEN A. DEVRIES, COGENCY GLOBAL INC., CITIGROUP GLOBAL MARKETS INC., and CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, | JURY TRIAL DEMANDED |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiffs Chien-Lung Tseng, Billy Sung, and Jerry Yue ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by Defendant RLX Technology Inc., ("RLX" or the "Company"), reports and information available on the internet, news reports and articles from the People's Republic of China ("China") along with certified translations when available, interviews with industry participants in China, and interviews with

regulatory officials in China.   Lead Plaintiffs believe that additional, substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired RLX American Depositary Shares ("ADS") pursuant or traceable to the F-1 registration statement (including all amendments made thereto) and related prospectus on Form 424B4 (collectively, the "Registration Statement") issued in connection with RLX's January 2021 initial public stock offering (the "IPO" or the "Offering") and who were damaged thereby.

2.      This action asserts non-fraud, strict liability claims under §§ 11, 12, and 15 of the Securities Act of 1933 (the "1933 Act" or "Securities Act"), against RLX, certain RLX officers and directors, the underwriters of the IPO, and RLX's U.S. representatives (collectively, the "Defendants," identified individually below).

3.      RLX purports to be the "No. 1 branded e-vapor company in China," which it also claims is its "largest potential market."   RLX conducted its IPO in New York and its ADS are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "RLX."   In connection with RLX's IPO, in January 2021, Defendants issued approximately 116.5 million ADS at the offering price of $12.00 per ADS pursuant to the Registration Statement.

4.      In short, and as set forth more fully herein, the Registration Statement misrepresented and omitted to state that prior to and at the time of the IPO, as part of an ongoing regulatory initiative, Chinese regulatory entities were already crafting national standards for e-cigarettes that would bring them into line with regular cigarette regulations.   Furthermore, these same regulatory entities had repeatedly disclosed that the regulations were certain to be enacted.

5.      In particular, the Registration Statement omitted to state that the State Tobacco Monopoly Administration, among other regulators and government officials, intended to align e-cigarette regulation with traditional tobacco products.  Indeed, since at least September 18, 2017, more than three years prior to the IPO, the State Tobacco Monopoly Administration revealed that it was actively engaged in strengthening the supervision of new tobacco products, such as e-cigarettes.   In addition to and in keeping with the intention of the State Tobacco Monopoly Administration, other regulatory bodies repeatedly disclosed plans to align regulation of e-cigarettes with traditional tobacco products and cigarettes.

6.      Indeed, the Registration Statement did not adequately disclose **any** information concerning the risks associated with the certain and imminent regulations (publicly revealed in draft form on March 22, 2021) and their effect on the Company (post-IPO).  The Registration Statement contained an untrue statements of fact when it disclosed: "***We cannot assure you that the government authorities will not impose further restrictions on e-vapor products in the future … Such restrictions, if any, may adversely affect … production and sales activities … or other aspects of our business operations***[,]" and that : "***[i]t is uncertain how government authorities in China will regulate e-vapor products or harm reduction products in general and what additional regulations we may be subject to***."

7.      In fact, as set forth below, at the time of the IPO, authorities in China had already ***repeatedly*** indicated that they ***were*** and would continue to regulate e-vapor products and that treatment of these products as tobacco products was a *fait accompli*.  Given that regulators like the State Tobacco Monopoly Administration and other government officials were unequivocal as to their plans to align e-cigarettes and new tobacco products with traditional tobacco regulation, the Company's exposure to such risks was paramount and Defendants were obligated to disclose those

risks.

8.     As a consequence, the Registration Statement was negligently prepared in that Defendants painted an incomplete and materially misleading picture of the regulatory environment in China.

9.     By omitting these facts and by misrepresenting the regulatory environment and that the accompanying risk of regulation was a mere contingent possibility rather than an imminent inevitably, Plaintiff and other ADS purchasers were unable to adequately assess the fair value of the shares offered in connection with the IPO.  Thus, class members purchased their ADS without material information and to their detriment.

10.     As result of the deficient Registration Statement, Defendants have violated their independent, affirmative duty to provide adequate disclosures about known adverse conditions, trends, risks, and uncertainties.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations) ("Item 303").

11.     Defendants also violated their independent, affirmative duty to adequately "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky," failing to disclose risks that had already materialized at the time of the IPO that were unknown to Lead Plaintiffs and other investors.  *See* Item 105 of SEC Reg. 14S-K, 17 CFR § 229.105 ("Item 105").

12.     Despite the Registration Statement's material misrepresentations and omissions, Defendants proceeded with the IPO and raised approximately $1.4 billion in gross proceeds.

13.     In their capacities as signers and/or authorizers of the Registration Statement or as an issuer, statutory seller, offeror, named director, control person or underwriter of shares sold pursuant to the IPO, each of the Defendants is strictly liable for such misstatements and omissions therein.

14.     Prior to the market opening on March 22, 2021, a mere eight weeks after RLX's IPO, draft regulations were posted by the Ministry of Industry and Information Technology and State Tobacco Monopoly Administration, which confirmed that e-cigarettes would be regulated similar to traditional tobacco offerings, bringing to fruition what regulators and government officials had repeatedly stated since 2017.[1]   Accordingly, as investors were caught unaware based on the representations in the Registration Statement, when this news was revealed, RLX ADS suffered an enormous decline, declining 48% from $19.46 per ADS at close on March 19, 2021, the previous trading day, to close at $10.15 per ADS.

15.     The price of RLX ADS has not recovered.  As of the date this complaint was filed, RLX ADS traded as low as $3.70 per share, or over 69% below the $12.00 IPO offering price. Collectively, investors have suffered hundreds of millions of dollars in losses.

---

[1] While the regulatory and governmental declarations were reported and announced in China, the information was not reasonably available to the typical U.S. investor.  In fact, the typical U.S. investor would have to overcome multiple impediments to access this information.  In the first instance, to the extent this information was available at all, U.S. investors would have to locate the information online.  Second, even if the U.S. investor was able to locate the correct webpage with the announcement, they would then have to either overcome firewall protections triggered by the lack of security encryption on the websites where information was available or risk accessing an unsecured website.  Third, even if the typical U.S. investor was able to overcome any firewall protection and ignore online security concerns, a typical U.S. investor is unable to read Chinese and would have to obtain a certified translation to ensure the translation was accurate.  Thus, the information was not reasonably available to the typical U.S. investor and not absorbed by the market, which is reinforced by the significant drop in value of RLX ADS when the truth was revealed to the market.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and § 22 of the Securities Act, 15 U.S.C. § 77v.

18.     Venue is properly laid in this District pursuant to § 22 of the Securities Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the publication of false and/or misleading statements of material facts, occurred in this District.  In addition, RLX ADS are listed on the NYSE, a national securities exchange, which is located in this District.

19.     In connection with acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of a national securities exchange.

## PARTIES

20.     Lead Plaintiffs purchased RLX's ADS pursuant and traceable to the Registration Statement and the IPO and were damaged thereby.

21.     Defendant RLX manufactures and sells vaping and e-cigarette products in China. RLX conducted the IPO in New York, and its ADS are listed on the NYSE under the ticker symbol "RLX."  Despite the IPO, RLX will remain a "controlled company" as defined under the NYSE Listed Company Manual because its parent, Relx Inc., will hold all of the outstanding Class B ordinary shares, representing 99.1% of the total voting power.  After the completion of the IPO, Relx Holdings Limited, a British Virgin Islands company controlled by Defendant Wang (defined

below), holds all of the outstanding Class B ordinary shares, representing more than 50% of the total voting power in the Company. Further, according to the Registration Statement, RLX anticipated that the existing shareholders of Relx Inc. would become shareholders of RLX "through a distribution of [RLX] shares in proportion with Relx Inc., shareholding structure at the time[.]"

22.     Defendant Ying (Kate) Wang ("Wang") founded RLX and was, at the time of the IPO, the Company's Chief Executive Officer ("CEO") and Chairperson of RLX's Board of Directors (the "Board"). Defendant Wang reviewed, contributed to, and signed the Registration Statement.

23.     Defendant Long (David) Jiang ("Jiang") founded RLX and was, at the time of the IPO, director on the Board. Defendant Jiang reviewed, contributed to, and signed the Registration Statement, and/or authorized the signing thereof.

24.     Defendant Yilong Wen ("Wen") founded RLX and was, at the time of the IPO, a director on the Board. Defendant Wen reviewed, contributed to, and signed the Registration Statement, and/or authorized the signing thereof.

25.     Defendant Yueduo (Rachel) Zhang ("Zhang") was, at the time of the IPO, Head of Finance. Defendant Zhang reviewed, contributed to, and signed the Registration Statement, or authorized the signing thereof.

26.     Defendant Colleen A. DeVries ("DeVries") served as Senior Vice President on behalf of Defendant Cogency, the designated U.S. representative of Defendant RLX, and reviewed, contributed to, and signed the Registration Statement.

27.     Defendants Wang, Jiang, Wen, Zhang, and DeVries are collectively referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration

Statement and solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and the Registration Statement, all motivated by their own and the Company's financial interests.

28.     Defendant Cogency Global Inc., ("Cogency") was RLX's authorized U.S. representative for purposes of the IPO.   Defendant DeVries, who signed the Registration Statement, is an employee of Defendant Cogency.   As a result, Defendant Cogency is liable for the securities law violations committed by Defendant DeVries, in its capacity as employer and as a control person under the Securities Act.

29.     Defendant Citigroup Global Markets Inc., ("Citigroup") and China Renaissance Securities (Hong Kong) Limited ("China Renaissance") are financial services companies that acted as underwriters for RLX's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase RLX securities issued pursuant thereto.   These Defendants are referred to herein as the "Underwriter Defendants."

30.     The total underwriting discounts and commissions to be paid to the Underwriter Defendants were 3.25% of the total amount of the offering, which came to $52,250,250 at full exercise of the Underwriter Defendants' option to purchase additional ADS.

31.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

  a.   The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities.   They served as the underwriters of the IPO and received tens of millions of dollars in fees (collectively), for their services.   The Underwriter Defendants, during which they and representatives from RLX, met with potential investors and presented highly favorable

information about the Company, its operations, and its financial prospects.

b. The Underwriter Defendants also demanded and obtained an agreement from RLX and the Individual Defendants, which stated that RLX would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that RLX had purchased millions of dollars in directors' and officers' liability insurance.

c. Representatives of the Underwriter Defendants also assisted RLX and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of RLX, an undertaking known as "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their due diligence, the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning RLX's most up-to-date operational and financial results and prospects.

d. In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with RLX's lawyers, management, and top executives and engaged in "drafting sessions" ahead of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which RLX ADS would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about RLX would be made in the Registration Statement; and (v) what responses would be made to the SEC, in connection with its review of the Registration Statement. As a result of those

constant contacts and communications between the Underwriter Defendants'
representatives and RLX's management and top executives, the Underwriter
Defendants knew of, or in the exercise of reasonable care should have known of,
RLX's existing problems as detailed herein.

e.   Finally, the Underwriter Defendants caused the Registration Statement to be filed
with the SEC and declared effective in connection with the offers and sales of
securities registered thereby, including those to Plaintiff and other members of the
Class.

## SUBSTANTIVE ALLEGATIONS

**A.   The Rising Regulatory Regime Concerning E-Cigarettes in China**

32.   Since their introduction, e-cigarettes and new tobacco products have experienced
an exponential increase in popularity in China.  RLX seized that opportunity, becoming the number
one branded e-vapor company in China capturing 48% and 62.6% of market share of closed-
system e-vapor products in terms of retail sales value in 2019 and the first nine months of 2020,
ending September 30, 2020.   According to a survey conducted by the Chinese Investment
Corporation, RLX ranked first in brand awareness, as evidenced by a mindshare of 67.6% among
users of e-vapor products in China.   These statistics were incorporated into the Registration
Statement.

33.   The State Tobacco Monopoly Administration, along with the China National
Tobacco Corporation, are responsible for centralized management of staff, finance, properties,
products, supply, distribution, and domestic and foreign trade of China's tobacco industry.  The
State Tobacco Monopoly Administration, specifically, is a Chinese government agency,
responsible for tobacco regulation.  The China National Tobacco Corporation is a state-owned

manufacturer of tobacco products operated by the Ministry of Industry and Information Technology of China.  With the rapid rise of e-cigarettes and new tobacco products, Chinese officials and regulators became increasingly concerned and sought to bring e-cigarettes in line with traditional tobacco products from a regulatory perspective.

34.     For instance, on September 18, 2017, and in Reply to Proposal No. 4237 of the Fifth Session of the 12th National People's Congress on the strengthening of supervision of new tobacco products such as e-cigarettes, the State Tobacco Monopoly Administration stated that it was actively studying and formulating a plan to strengthen supervision of e-cigarettes and was coordinating with legislative departments to formulate effective supervision policies and measures.[2]

35.     Specifically, the State Tobacco Monopoly Administration stated the following, as translated and in pertinent part:

Reply to Proposal No. 4237 of the Fifth Session of the 12th National People's Congress

Date: September 18, 2017

In response to the proposals on strengthening the supervision of new tobacco products such as electronic cigarettes put forward by the deputies of the 12th National People's Congress [], we hereby reply as follows:

Firstly*, the issue on incorporating Electronic cigarettes into the management of tobacco products[:]*

In order to standardize the market order of new tobacco products such as electronic cigarettes and safeguard consumers' rights and interests according to laws and regulations, *we are actively studying*

---

[2] Attached to the Amended Complaint ("Complaint") as Exhibit A is a copy of the following webpage: http://www.tobacco.gov.cn/gjyc/jytadf/20170918/bb6cf35f56bb4555a42622b062be89e7.shtml, which concerns the State Tobacco Monopoly Administration's Reply to Recommendation No. 4237 of the Fifth Session of the 12th National People's Congress.  Attached to the Complaint as Exhibit B is a copy of a certified translation of the same webpage.

> ***and formulating a feasible scheme to strengthen the supervision of new tobacco products such as Electronic cigarettes, coordinating with legislative departments to formulate effective supervision policies and measures, and promoting the establishment of general technical standards, product launch rules and marketing rules for new tobacco products such as Electronic cigarettes.***
>
> …
>
> We exercise monopoly management on the production, sale, import and export of monopolized tobacco products on behalf of the state according to law.  At the same time, according to the uniform arrangement from the state, we participate in China's implementation of the Framework Convention on Tobacco Control**. *In the future, we will strengthen the supervision of new tobacco products such as Electronic cigarettes within the scope of our authority and powers.***

(Emphasis added.)[3]

36.     Accordingly, from as early as September 2017, the State Tobacco Monopoly Administration stated that it would and, indeed, was actively working on regulations to bring e-cigarettes and new tobacco products in line with regulations of traditional tobacco products.

37.     The Registration Statement did not disclose anything, at all, in connection with the September 2017 announcement.

38.     Subsequently, on August 28, 2018, the State Tobacco Monopoly Administration and State Administration for Market Regulation issued the Notice on Prohibiting Sale of E-cigarettes to Minors.[4]  Accordingly, just as with traditional tobacco products, all market entities, such as RLX, were prohibited from selling e-cigarettes to minors.

---

[3] Exhibit B to the Complaint.

[4] *Announcement of the State Administration for Market Regulation and the State Tobacco Monopoly Administration on Prohibiting the Sale of Electronic Cigarettes to Minors*, State Admin. for Mkt. Reg. (Feb. 17, 2019), http://gkml.samr.gov.cn/nsjg/bgt/201902/t20190217_288901.html# (last visited Nov. 4, 2021).

39.     During 2018, RLX ensured its cooperation with the directives of the Notice on Prohibiting Sale of E-cigarettes to Minors.  For instance, RLX printed a warning on its packaging and manual that "Minors Are Not Allowed to Use."  RLX's prompt compliance with this directive signaled that RLX was already treating the State Tobacco Monopoly Administration as a primary regulator.

40.     On October 16, 2018, the State Tobacco Monopoly Administration issued its Reply to Proposal No. 6801 of the First Session of the 13th National People's Congress.[5]  Therein, the State Tobacco Monopoly Administration replied that it fully agreed to regulate e-cigarettes as tobacco products and resolved to closely follow up the progress of e-cigarette regulatory legislation and would push for early introduction of relevant legislation or policies in a timely manner.  The State Tobacco Monopoly Administration stated the following, as translated and in pertinent part:

> Reply to Proposal No. 6801 of the First Session of the 13th
> National People's Congress
>
> Date: October 16, 2018
>
> In response to the proposals on building Yunnan into an international development base of the national new tobacco products industry put forward by the deputies of the 13th National People's Congress, we hereby reply as follows:
>
> ***Firstly, the issue on management of new tobacco products as tobacco products[:]***
>
> ***We fully agree that heated cigarettes, Electronic cigarettes and other new tobacco products <u>shall be</u> managed as tobacco products.***
>
> In respect of heated cigarettes.  As its tobacco stick is mainly made of cut tobacco wrapped with cigarette paper and other auxiliary materials, it can produce smoke for smoking or sniffing after

---

[5]  Attached to the Complaint as Exhibit C is a copy of the following webpage: http://www.tobacco.gov.cn/gjyc/jytadf/20181016/8243b17815a54bfd87a17a624e17bb72.shtml, which concerns the State Tobacco Monopoly Administration's Reply to Recommendation No. 6801 of the First Session of the 13th National People's Congress.  Exhibit D to the Complaint is a certified translation of the webpage attached as Exhibit C.

heating, which fully meets the basic criteria of traditional cigarettes. Therefore, it is essentially a cigarette stipulated in the Tobacco Monopoly Law and shall be managed as tobacco products.  At present, we have provided clear supervision opinions on heated cigarettes in the market, and requires all law enforcement units to carry out market investigation and punishment of heated cigarettes in accordance with various supervision regulations of traditional cigarettes.

In respect of Electronic cigarettes[,] [w]e believe that although Electronic cigarettes containing nicotine is different from traditional cigarettes in appearance, it also takes nicotinamide as the main consumption component and leads to addiction and health risks.  ***Therefore, we believe that Electronic cigarettes containing nicotine shall also be included in the supervision of tobacco products.  As present, we are actively promoting the regulatory legislation of Electronic cigarettes containing nicotine and waiting for further instructions from relevant departments.  In the next step, we will closely follow up the follow-up progress of Electronic cigarettes supervision legislation, hoping to promote the promulgation of relevant legislation or policies promptly and timely.***

(Emphasis added.)[6]

41.    The State Tobacco Monopoly Administration reiterated its view, first expressed in September 2017, that "heated cigarettes, Electronic cigarettes and other new tobacco products ***shall be managed as tobacco products***." *Id.*

42.    The Registration Statement did not disclose anything, at all, in connection with the October 2018 announcement.

43.    Other authorities followed suit and began bringing regulatory treatment of e-cigarettes in line with other traditional tobacco products.

44.    For example, on January 1, 2019, the Hangzhou Municipal Government implemented the Regulations of Hangzhou City on Smoking Control in Public Places, which

---

[6] Exhibit D.

included e-cigarettes alongside other traditional tobacco products in the smoking ban in Hangzhou.[7]

45. Weeks later, on January 22, 2019, the Civil Aviation Administration of China issued the Notice on a Total Ban on Smoking in the Cockpit, which included a complete ban on general tobacco and e-cigarettes.[8]

46. On May 22, 2019, the State Council announced Railway Safety Management Regulations, which make clear that e-cigarette smoke triggers smoke alarms inside trains causing serious issues. Accordingly, "Do Not Use E-cigarette" signage was displayed and those who violated the warning were punished.[9]

47. On June 26, 2019, the Shenzhen Municipal Government issued Regulations on Smoking Control in Shenzhen Special Economic Zone, which formally included e-cigarettes in tobacco control management.[10]

48. In February 2019, RLX officially implemented the "Guardian Program" and completed the full coverage of the "Guardian Plan" on its products and channels within one

---

[7] *The new version of "Hangzhou City's Regulations on Smoking Control in Public Places" is officially implemented. Binjiang enters the "smoke-free era,"* Paradise Silicon Valley News (Jan. 2, 2019), http://www.hhtz.gov.cn/art/2019/1/2/art_1487008_29217381.html (last visited Nov. 4, 2021).

[8] *Civil Aviation Administration: Starting from the 25th of this month, smoking in the cockpit will be completely banned!*, China Focus (Jan. 23, 2019), http://news.ycwb.com/2019-01/23/content_30183070.htm (last visited Nov. 4, 2021).

[9] *E-cigarette regulation will make greater progress*, Baidu (July 14, 2020), https://baijiahao.baidu.com/s?id=1672155808735987328&wfr=spider&for=pc (last visited Nov. 4, 2021).

[10] *Shenzhen will include e-cigarettes in the "blacklist" of tobacco control: The latest Shenzhen Special Economic Zone on Smoking Control Regulations*, Max Law (June 28, 2019), http://www.maxlaw.cn/n/20190628/950633767763.shtml (last visited Nov. 4, 2021).

month.[11]

49.     In March 2019, Defendant Ying clarified two propositions of the "Guardian Program" – that it was "against the sale of cigarettes to minors and against the use of e-cigarettes in front of minors."  The "Guardian Program" was in further response to the directives of the State Tobacco Monopoly Administration.[12]

50.     On July 22, 2019, Mao Qun'an, the Director of Planning Division of the National Health Commission, indicated that the National Health Commission plans to pass legislation to regulate e-cigarettes.[13]

51.     In August 2019 and in further response to regulatory pressure, RLX, jointly with Alipay, launched a smart vending machine with face scan recognition and age check technology, which switches off the power function to prevent minors from purchasing e-cigarettes.[14] This measure was again in further response to the directives of the State Tobacco Monopoly Administration.

52.     Then, on September 29, 2019, the State Tobacco Monopoly Administration issued its Letter of Reply to Proposal No. 2991 of the Second Session of the 13th National Committee of the Chinese People's Political Consultative Conference ("CPPCC").[15]

---

[11] *Our Mission*, RELX,  https://www.relxscience.com/nine-moments-of-the-guardian-plan-in-2019/ (last visited Nov. 4, 2021).

[12] *Id.*

[13] Pan Zixuan, *National Health Commission: plans to pass legislation to supervise e-cigarettes*, Baidu (July 22, 2019), https://baijiahao.baidu.com/s?id=1639745017216531502&wfr=spider&for=pc (last visited Nov. 4, 2021).

[14] *See supra* note 10.

[15] Attached to the Complaint as Exhibit E is a copy of the following webpage: http://www.tobacco.gov.cn/gjyc/jytadf/20190929/b91a319fe73b4a319710c0f74d6e9475.shtml, which concerns the State Tobacco Monopoly Administration's Letter of Reply to Proposal No.

53.     Proposal No. 2991, which was crafted by members of the 13th National Committee of the CPPCC, appeared to concern proposed legislation that completely banned new smoking products such as e-cigarettes.

54.     In response, the State Tobacco Monopoly Administration replied that "we *will continue to* [. . .] actively promote the introduction of control measures for new tobacco products such as Electronic cigarettes."[16]

55.     The Registration Statement did not disclose anything, at all, in connection with the September 2019 announcement.

56.     On November 1, 2019, the State Administration for Market Regulation and State Tobacco Monopoly Administration issued the Notice on Further Protecting Minors from E-cigarettes, which urged e-cigarette manufacturers, sales companies, or individuals to close online e-cigarette sales channels and withdraw e-cigarette advertisements posted on the internet.[17]

57.     Just days later, on November 10, 2019, the National Health Commission, the Publicity Department of the Communist Party of China, the Ministry of Education, the National Radio Television Administration, the Central Committee of the Communist Youth League, All China Women's Federation, the Statement Administration for Market Regulation, and the State Tobacco Monopoly Administration issued the Notice on Further Strengthening Tobacco Control among Young People, which aimed to strengthen publicity on the dangers of e-cigarettes and

---

2991 (Medical sports 324) of the Second Session of the 13th National Committee of the CPPCC. Attached as Exhibit F is a copy of a certified translation of the same webpage.

[16] *Id.*

[17] *Notice on further protecting minors from e-cigarettes*, State Admin. for Mkt. Reg. (Nov. 1, 2019), http://gkml.samr.gov.cn/nsjg/xyjgs/201911/t20191101_308077.html (last visited Nov. 4, 2021).

censorship of smoking scenes in movies and television programs in order to discourage the use of e-cigarettes by young people.[18]

58.     RLX once again responded to the State Tobacco Monopoly Administration's efforts and specifically, the Notice on Further Protecting Minors from E-cigarettes, by issuing a statement that it firmly supports and implements the online ban on e-cigarettes and made a corresponding upgrade to the store's "Guardian Program."[19]

59.     Then, on November 6, 2019, RLX terminated all self-operated online sales, closing all of its stores on e-commerce platforms.

60.     Weeks later, on December 1, 2019, RLX issued and implemented the "Guardian Program" Management Penalty Regulations in all sales channels and set-up an independent inspection team to conduct random field inspections of RLX sales stores.  Pursuant to these internal rules, stores and retail outlets caught in violation of the regulation would be punished.

61.     On July 1, 2020, the State Administration for Market Regulation and the State Tobacco Monopoly Administration announced the E-cigarette Market Special Inspection Action Plan, which identified inspection tasks, working mechanisms, and time arrangement of the special action of e-cigarette market to further protect minors from e-cigarettes and prevent the e-cigarette market from resurgence.[20]

---

[18] *Eight Ministries: Strengthen the publicity of the hazards of e-cigarettes and the review of smoking shots in film and television works*, State Admin. for Mkt. Reg. (Nov. 10, 2019), http://www.samr.gov.cn/ggjgs/sjdt/gzdt/201911/t20191112_308397.html (last visited Nov. 4, 2021).

[19] *See supra* note 10.

[20] *Notice of the State Tobacco Monopoly Administration and the State Administration for Market Regulation on Issuing the Action Plan for Special Inspections on the Electronic Cigarette Market*, State Admin. for Mkt. Reg. (July 14, 2020), http://gkml.samr.gov.cn/nsjg/xyjgs/202007/t20200714_319661.html# (last visited Nov. 4, 2021); *Policy Interpretation of the "Special Inspection Action Plan for the Electronic Cigarette*

62.     Accordingly, the State Tobacco Monopoly Administration was continuing its pattern of acting as the primary regulator of RLX – conduct that aligned with the agency's prior representations regarding e-cigarettes and new tobacco products.  Two days later, on July 3, 2020, the NPC Standing Committee issued for second review the revised draft of the Laws on the Protection of Minors, pursuant to which parents or guardians of minors shall not allow or instigate minors to smoke (including e-cigarettes).[21]

63.     On July 17, 2020, RLX hosted via live broadcast feed a Guarding Minor Remobilization Conference during which RLX encouraged offline stores to deepen their implementation of the "Notice on Further Protecting Minors from E-cigarettes" and actively cooperate with the local "E-cigarette Market Special Inspection Action."[22]   In connection therewith, Defendant Ying expressed that: "We strongly feel that with unified policy and guidance, coupled with the continuous efforts of everyone in the industry, the entire society will better fulfill this social responsibility."[23]

64.     From August 2 through 4, 2020, Zhang Jianmin ("Jianmin"), Director of the State Tobacco Monopoly Administration visited Chongqing and discussed tobacco reform and

---

*Market,"* State Admin. for Mkt. Reg  (July 20, 2020), http://gkml.samr.gov.cn/nsjg/xwxcs/202007/t20200714_319657.html (last visited Nov. 4, 2021).

[21] *Publicly solicit opinions on the "Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China (Draft for Solicitation of Comments),"* Ministry of Indust. & Info. Tech. of the People's Republic of China (Mar. 22, 2021), https://www.miit.gov.cn/jgsj/zfs/gzdt/art/2021/art_e233af8bb3484ed59e98dbb79e49a0bd.html (last visited Nov. 4, 2021).

[22] *How to protect minors? RELX CEO Wang Ying: Only by continuous dedication can we win the trust and respect of the society,* Qianlong (July 17, 2020), http://china.qianlong.com/2020/0717/4440886.shtml (last visited Nov. 4, 2021).

[23] *Id.*

development with local government and regulatory officials.[24]   Director Jianmin visited the Logistics Branch of Chongqing Tobacco Monopoly Administration, the Chongqing Cigarette Factory, and Technological Center of China Tobacco Chongqing Industrial Co. Ltd.   During these meetings, Director Jianmin emphasized continuous strengthening of e-cigarette supervision with strict regulation of production and operations.[25]

65.    Then, from August 4 through 6, 2020, Director Jianmin visited Tibet to exchange views with government officials on tobacco reform and development.[26]   During his visit with the Tobacco Monopoly Administration of Tibet Autonomous Region, Director Jianmin spoke about the need to carry out in-depth special inspection actions on the e-cigarette market to strictly regulate business practices.[27]

**B.    The False and Misleading Statements in the Registration Statement**

66.    On October 26, 2020, RLX filed with the SEC a confidential draft registration statement on Form F-1, which would be used in connection with the IPO, following a series of amendments in response to SEC comments.

67.    On January 19, 2021, RLX filed its final amendment to the Registration Statement, which registered 133,975,000 RLX ADS for public sale.   The SEC declared the Registration Statement effective on January 21, 2021.   On January 22, 2021, Defendants priced the IPO at

---

[24]   *Zhang Jianmin investigates in Chongqing Tobacco*, China Tobacco (Aug. 5, 2020), http://www.tobacco.gov.cn/gjyc/ldhd/20200805/eab23b4ac63c4e02bcf52cdd1104ae94.shtml (last visited Nov. 4, 2021).

[25]   *See id.*

[26]   *Zhang Jianmin investigates tobacco in Tibet*, China Tobacco (Aug. 7, 2020), http://www.tobacco.gov.cn/gjyc/ldhd/20200807/0b61da67bdab4009a94336ec1f37c65e.shtml (last visited Nov. 4, 2021).

[27]   *See id.*

$12.00 per ADS and filed the final prospectus for the IPO, which forms part of the Registration Statement.  Through the IPO, Defendants issued and sold approximately 116,500,000 RLX for gross proceeds of nearly $1.4 billion.

68.     The Registration Statement was negligently prepared and contained untrue and materially misleading statements of fact and omitted material information both required by governing regulations and necessary to make the statements therein not misleading.

69.     Specifically, the Registration Statement misrepresented and omitted RLX's exposure to China's regulatory environment and campaign to establish national and regional standards for e-cigarettes, which would bring them in line with traditional cigarette regulations. For example, with respect to regulations, the Registration Statement stated as follows:

> Regulations Related to Our Products
>
> ***Currently, our e-vapor products are not specifically defined as "tobacco products" under the tobacco monopoly license systems of the PRC, and thus our products are not under the administration of the tobacco monopoly system and do not violate relevant laws and regulations relating to tobacco monopoly.  Except for the announcements prohibiting the sale of e-cigarettes, including e-vapor products, to juveniles and sale through the internet, as well as the smoking control rules of some cities regarding using e-cigarettes as a form of smoking, there are currently no laws and regulations which specifically govern the distribution of e-cigarettes in the PRC.*** We are therefore subject to general PRC business licensing requirements and its business operations are subject to laws and regulations that are generally applicable to electronic products, such as laws and regulations relating to product quality and consumer rights.

(Emphasis added.)

70.     Likewise, the Registration Statement expressly distanced RLX from falling under the administration of China's tobacco monopoly system, stating in relevant part:

Tobacco Monopoly Law

The Tobacco Monopoly Law of the PRC, or the Tobacco Monopoly Law, adopted by the Standing Committee of the National People's Congress on June 29, 1991 and last amended on April 24, 2015, and the Implementation Regulation of the Tobacco Monopoly Law issued by the State Council on July 3, 1997 and last amended on February 6, 2016, stipulated a tobacco monopoly license system for tobacco monopoly commodities. Pursuant to the Tobacco Monopoly Law and its Implementation Regulation, the state exercised monopoly administration in accordance with law over the production and sale of tobacco monopoly commodities; "tobacco monopoly commodities" refers to cigarettes, cigars, cut tobacco, redried leaf tobacco, leaf tobacco, cigarette paper, filter rods, cigarette tow and special tobacco machines. Cigarettes, cigars, cut tobacco and redried leaf tobacco are generally referred to as "tobacco products" under the Tobacco Monopoly Law. ***Our products are not currently defined as "tobacco products" in the Tobacco Monopoly Law and its Implementation Regulation.***

(Emphasis added.)

71.     These statements omitted to state the material fact that the State Tobacco Monopoly Administration was actively preparing a national standard for e-cigarettes, which would regulate them as traditional tobacco products. Indeed, as early as September 2017, the State Tobacco Monopoly Administration declared it "***will*** strengthen the supervision of new tobacco products such as Electronic cigarettes." *See* Exs. A-B. In October 2018, the State Tobacco Monopoly Administration restated its intent to regulate e-cigarettes and explicitly agreed that "[e]lectronic cigarettes and other new tobacco products ***shall*** be managed as tobacco products." *See* Exs. C-D. And, in September 2019, the State Tobacco Monopoly Administration responded to Proposal No. 2991, which appeared to ban new smoking products like e-cigarettes, by affirming that it "***will*** continue to [. . .] actively promote the introduction of control measures for new tobacco products such as Electronic cigarettes." *See* Exs. E-F. Individually, any one of these statements confirm that, at the time of the IPO, the State Tobacco Monopoly was actively preparing to regulate e-vapor products and that treatment of these products as tobacco products was a *fait accompli.*

22

72.     The failure to clarify that regulation was forthcoming and that regulators had expressly declared that the Company's products would be regulated like traditional tobacco was necessary to make the statements above, which expressly distinguish the Company's e-vapor products from traditional tobacco and downplay any regulatory risk from the State Tobacco Monopoly Administration, not materially false and misleading by omission.

73.     Furthermore, Defendants were obliged to make these disclosures pursuant to Item 105 because a national standard that would align e-vapor products with traditional tobacco products made an investment in RLX "speculative" and "risky."  The imminent alignment of e-cigarettes and other new tobacco products with traditional tobacco from a regulatory perspective would have an adverse material effect on RLX, rendering the investment speculative and risky considering the State Tobacco Monopoly Administration's repeated declarations that such a national standard would be forthcoming.  Indeed, in the worst case scenario, RLX could be entirely shut out of its largest market.

74.     For the same reason, Defendants were also duty-bound to disclose this material information pursuant to Item 303, which requires specific disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material … unfavorable impact on net sales or revenues or income from continuing operations."  Defendants knew about the State Tobacco Monopoly Administration's declarations and likewise, the regulatory wave from regional and national regulators, which began the process of aligning e-cigarettes and new tobacco products with traditional tobacco products, like cigarettes.

75.     Instead of making complete disclosures, Defendants downplayed the risk of regulation and painted existing regulatory efforts as discrete and limited in scope, rather than harbingers for the forthcoming national standard being actively prepared by the State Tobacco

Monopoly Administration at the behest and with the support of governmental officials.

76.     Rather than clarify, the Registration Statement continued the false and misleading narrative that RLX was not facing imminent regulatory changes.  RLX emphasized that the only isolated regulations enacted by the State Tobacco Monopoly Administration were to limit the sale of e-vapor products to the underage.  Defendants also represented that RLX was unaware of how government authorities in China planned to regulate e-vapor products, if at all, despite the State Tobacco Monopoly Administration's statements before the 12th and 13th National People's Congress and the 13th National Committee of the CPCC, and all regulatory action taken and discussions indicating otherwise.

77.     Specifically, the Registration Statement stated in relevant part:

> ***Changes in existing laws, regulation and policies and the issuance of news laws, regulation, policies and any other entry barriers in relation to the e-vapor industry*** have materially and adversely affected and ***<u>may</u> further materially and adversely affect our business operations.***
>
> As e-vapor products have become more and more popular in recent years, ***government authorities <u>may</u> impose more stringent laws, regulations and policies to regulate such products and the e-vapor industry.***
>
> Some countries have prohibited the usage of e-vapor products in certain areas or imposed specific taxes on e-vapor products. ***In China, there are currently no clear and specific national laws, regulations, rules or standards for the sale of e-cigarettes, including e-vapor products, save for the announcements regarding prohibition on the sale of cigarettes to the underage as well as online advertisement and sale through the internet.*** On August 28, 2018, the State Administration for Market Regulation and the State Tobacco Monopoly Administration jointly issued Announcement on Prohibition of Selling E-Cigarettes Products to the Underage, or the August 2018 Announcement, which specifically prohibits all sales of e-cigarettes to the underage. On October 30, 2019, the State Administration for Market Regulation and the State Tobacco Monopoly Administration jointly issued the Announcement on Further Protecting the Underage from E-Cigarettes, or the October 2019 Announcement, to further

strengthen the protection of the physical and mental health of the underage and prevent the underage from buying e-cigarettes through the internet and using them. The October 2019 Announcement urged (i) e-cigarette producers and sellers to shut down their online sales websites or online sales application programs and to withdraw the advertisements published on the internet; and (ii) e-commerce platform operators to close e-cigarette online shops and take e-cigarettes off shelves. We sold some of our products online prior to the issuance of the October 2019 Announcement, and we took necessary measures to adjust our business to follow the October 2019 Announcement, including but not limited to the ceasing of online operations and online marketing activities and rigorously implementing underage usage prevention initiatives. As a result of the October 2019 Announcement and our adjustment measures, revenues generated from sales to users through third-party e-commerce platforms and sales to third-party e-commerce platform distributors decreased significantly to nominal, and we do not expect to generate revenues from selling e-vapor products through these distribution channels going forward.

***The August 2018 Announcement and the October 2019 Announcement, as well as any laws, regulations or governmental announcements that regulate the sale and use of e-cigarettes, may continue to adversely affect our business, growth and prospects.*** For example, the Notice of Maintaining Civil Aviation Order to Ensure Air Transportation Security promulgated by Civil Aviation Administration of China states that the usage of e-cigarettes would be treated as smoking and is therefore prohibited in aircrafts. In addition, some cities, such as Shenzhen, Hangzhou, Chengdu, Xi'an, Nanning and Chongqing, have banned the use of e-cigarettes in public places, which include, among others, public transportation and indoor workspace. Such prohibition may also affect the usage of our products, which may in turn adversely affect the sales of our products. Further, sales of e-cigarettes in China are also subject to relevant PRC laws and regulations that are generally applicable to the sales of goods, such as the PRC Civil Code and the Product Quality Law of the PRC. See "Regulation—Regulations Related to Our Products."

In addition, certain articles published on Bulletin of the WHO stated that governments should consider prohibiting the use of e-vapor products in indoor areas to protect non-users from involuntary exposure to second-hand aerosols, issuing warnings about the potential health risks of e-vapor products and imposing higher taxes on e-vapor products. Certain limitations may be imposed on the e-vapor industry, such as prohibition of usage in public spaces or

imposition of additional tax, either of which may materially and adversely affect the development of the e-vapor industry.

We cannot assure you that government authorities will not impose further restrictions on e-vapor products in the future, including but not limited to requirements to obtain and maintain licenses, approvals or permits for relevant business operation. Such restrictions, *if any*, may adversely affect supplies of raw materials, production and sales activities, taxation or other aspects of our business operation. We may not be able to comply with any or all changes in existing laws and regulations or any new laws and regulations and may incur significant compliance cost. ***It is underlined how government authorities in China will regulate e-vapor products or harm-reduction products in general and what additional regulations we may be subject to.*** All of the above may affect our production or market demand for e-vapor products, and thus adversely affect our business, financial condition and results of operations. As we continue to grow in scale and significance, we expect to face increased scrutiny, which may result in increased investment in compliance and related capabilities.

(Emphasis added.)

78.     Defendants' disclosures of potential, hypothetical regulations did not accurately reflect the regulatory environment in which RLX was operating in at the time of the IPO, where the State Tobacco Monopoly Administration had already stated that it "***will***" and "***shall***" regulate e-cigarettes as tobacco products, and the accompanying regulatory wave from both regional and national regulators following that declaration, which aligned e-vapor products with traditional cigarettes and tobacco products.  Instead of acknowledging this known risk and regulatory trend, Defendants portrayed the regulatory environment as "uncertain," passively warning that the imposition of "more stringent" laws and regulations ***may*** follow.

79.     Additionally, in the Registration Statement, while Defendants downplayed the imminent regulatory changes afoot in China, they also presented financial information to support their claim that "RLX [w]as the industry leader," and that its then-existing financial condition (and future prospects) were bright.  In truth, however, the Company's financials were inaccurate and

because regulators in China were already actively preparing a national standard for e-cigarettes, which would regulate them as traditional tobacco products and, thus, upend the Company's business, RLX's financials were not indicative of RLX's future financial performance.

**C.     The Draft Regulations Deliver on the State Tobacco Monopoly Administration's Promise to Regulate E-cigarettes As a Tobacco Product**

80.     On March 22, 2021, just eight weeks after RLX's IPO, the State Tobacco Monopoly Administration and the Ministry of Industry and Information Technology issued a solicitation for public comment on the draft Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China, under which e-cigarettes and other new tobacco products would be subject to the relevant regulations on cigarettes and traditional tobacco products.[28]

81.     The draft regulations aligned *exactly* with the October 16, 2018 agreement between State Tobacco Monopoly Administration and the 12th National People's Congress, stating that e-cigarettes would be regulated as tobacco products.

82.     The Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China (Draft for Soliciting Opinions) would add an article "as Article 65 in the Supplementary Provisions of the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China," which reads as follows: "New tobacco products such as Electronic cigarettes shall be implemented with reference to the relevant

---

[28] Attached to the Amended Complaint ("Complaint") as Exhibit G is a copy of the following webpage: https://www.miit.gov.cn/jgsj/zfs/gzdt/art/2021/art_e233af8bb3484ed59e98dbb79e49a0bd.html, which concerns the Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China and its accompanying annexes. Exhibit H is a certified translation of Exhibit G.

provisions on cigarettes in these Regulations."[29]

83.    The second annex to the solicitation was entitled, "Explanation of the Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China (Draft for Soliciting Opinions)."  This annex provides the "[c]ontents and main considerations of revision", which were as follows:

I.    Promotion of the legalization of Electronic cigarettes supervision.  In recent years, there have been some new situations and problems in the market supervision of tobacco products such as Electronic cigarettes, which are of greater concern to the whole society.  This revision mainly intends to implement the requirements of the CPC Central Committee and the State Council on promoting the legalization of Electronic cigarettes supervision, clarifying the legal basis for the supervision of new tobacco products such as Electronic cigarettes, and connect with the Law of the People's Republic of China on the Protection of Minors and other laws and regulations, so as to give full play to the important role of the rule of law in consolidating the governing foundation, stabilizing people's expectations and benefiting the long-term development.

II.    Compliance with the characteristics of Electronic cigarettes products and the current international regulatory practices.  In view of the homogeneity between new tobacco products such as Electronic cigarettes and traditional cigarettes in core components, product functions and consumption patterns, new tobacco products such as Electronic cigarettes shall be implemented concerning the relevant provisions on cigarettes in the Implementation Regulations.  This is also consistent with the supervision methods of new tobacco products such as Electronic cigarettes in major countries and regions in the world.

III.    Improvement of the supervision efficiency of Electronic cigarettes.  Implementing new tobacco products such as Electronic cigarettes with reference to the relevant provisions on cigarettes in the Implementation Regulations will greatly improve the supervision efficiency of Electronic cigarettes, effectively regulate the production and operation

---

[29] *Id.*

activities of Electronic cigarettes, solve the problems of
product quality and safety risks and false advertisements in
Electronic cigarettes, and effectively protect the legitimate
rights and interests of consumers.[30]

84.     On this news, the price of RLX ADS collapsed, closing at $10.15 per ADS on

March 22, 2021, or nearly 48% below its previous close on March 19, 2021 of $19.46 per ADS.

85.     According to a *Forbes* article published April 12, 2021, the market's panic was

justified.[31]  *Forbes* reported that these draft rules, which "would classify e-cigarettes as tobacco

products and potentially bring them under the control of the state monopoly, China Tobacco …

***could cause RLX's hard-fought market share to evaporate if authorities choose to regulate vapes***

***in the same way as cigarettes, rather than ill-defined tech devices.***"  (Emphasis added.)  In the

article, Patricia Kovacevic, a lawyer specializing in compliance for tobacco and vaping companies,

stated:  ***"Stricter regulation would decimate the domestic e-cigarette market.***"  (Emphasis added.)

86.     The *Forbes* article acknowledged that analysts outline "a range of potential

[regulatory] outcomes, from a consumption tax – almost certain to happen and unlikely to have a

large impact on RLX's fortunes – ***to a state-controlled licensing and quota system, which is less***

***likely but would drastically reduce the scope of the company's market.***"  (Emphasis added.)

Charlie Chen, of Defendant China Renaissance, an underwriter to the IPO, acknowledged that

"[i]n the traditional tobacco industry, cigarette sales volume and prices are all set by China

Tobacco[.] ***If this is applied to e-cigarettes, then that will remove all the value of the e-cigarette***

***companies.***"  (Emphasis added.)

---

[30] *Id*.

[31] *See* Tognini, Giacomo, *How This Chinese Billionaire Became One Of The World's Richest
Women In Three Years*, Forbes (Apr. 12, 2021),
https://www.forbes.com/sites/giacomotognini/2021/04/12/rlx-relx-chinese-vaping-billionaire-
kate-wang-one-of-the-worlds-richest-women-in-three-years/?sh=57cc27ac71b4 (last visited:
Nov. 8, 2021).

87.     Indeed, in the article, Mr. Chen revealed that the existence of RELX International – "a separate, privately-owned company with an opaque structure in which Wang is a director" – was potentially a proverbial hedge against such an outcome.  According to Mr. Chen, RLX may have separated the two businesses to maximize benefits and reduce risks. The article reports: "If the Chinese market keeps growing then it will be far more attractive to U.S. investors on its own rather than bundling it with the smaller international business, which makes up only 10% of overall sales.  Conversely, if publicly traded RLX were to be shut out of China by the state monopoly, RELX International's 18 markets – including Russia, South Korea and the U.K. – would remain independent of the Chinese business."

88.     None of these potential outcomes – ranging in severity, but all material to investors – were disclosed, nor was the "when, not if" regulatory authority of the State Tobacco Monopoly Administration that would trigger the material adverse effects on RLX.   Furthermore, the Registration Statement is completely devoid of any mention of RELX International.

## THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT

89.     Section 11 of the Securities Act provides that underwriters are liable for any false statements of material fact or the omission to state a material fact in a registration statement.  15 U.S.C. § 77k(a)(5).

90.     It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. *Goldman Sachs, Report of the Business Standards Committee, January 2011*, at p. 13. Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

91.     As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement.  To conduct proper due diligence, underwriters must take an adverse role to the issuer during the due diligence process.  In other words, the underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

92.     It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

93.     It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for RLX's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

94.     In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers."  Underwriters control both what information is in the offering documents and the dissemination of that information to potential investors.  There is much literature that supports the premise of investment banks serving as gatekeepers.  For example, the *Report of the Business Standards Committee*, dated January 2011, from Goldman Sachs describes the underwriter's function as follows: the underwriter "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the]issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure."  *Id.*  The *Report of the Business Standards Committee*

also acknowledges the underwriter's role as a gatekeeper, stating:

> An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors.  In this context, the securities laws effectively impose a gatekeeper role on [the underwriter]: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering.

*Id*. at 14.

95.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering.  Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their careful investigation of the offering."  Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998.  In other words, underwriters, such as the Underwriter Defendants here, have ultimate control over the contents and dissemination of the disclosure document – in this case, the Registration Statement.  Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided.  The Underwriter Defendants had this role and duty in underwriting RLX's ADS.

96.     Because investment banks have ultimate control over the contents and dissemination of the disclosure documents, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank would withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not

misleading.  This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

97.     The due diligence process by an investment bank is generally rigorous and thorough, requiring professional skepticism to be applied.  The due diligence process is not just a rubber-stamping of a company's/management's views or its auditor's opinion at face value.  The due diligence process is just the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

98.     The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to RLX's IPO.  For example, had the Underwriter Defendants performed adequate due diligence, they would have discovered that the State Tobacco Monopoly Administration, along with other regional regulators, were actively working on, promoting, and stating their intentions to align, regulation of new tobacco products, including e-cigarettes, with traditional tobacco products in advance of RLX's IPO.

**THE DIRECTORS' AND OFFICERS' DUE DILIGENCE OBLIGATIONS**

99.     As directors and/or officers of RLX and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of RLX and ensure that all of the statements in the Registration Statement were true and not misleading in any respect.

100.     The Individual Defendants had the ability to adequately inform themselves of the regulatory environment along the pronouncements and intentions of leading regulators in RLX's

primary market.  Likewise, the Individual Defendants had the ability to identify the effect that regulatory changes had and would have on the RLX's operational and financial results.  The Individual Defendants were, at least, negligent for failing to adequately inform themselves and ensure that the disclosures were accurate and not false and misleading.

## CLASS ACTION ALLEGATIONS

101.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, RLX ADS pursuant or traceable to the Registration Statement issued in connection with the Company's IPO (the "Class").

102.    Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by RLX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Lead Plaintiffs' claims are typical of the claims of the Class members, as all members of the Class are similarly affected by Defendants' wrongful conduct, in violation of the federal securities laws.

105.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation to prosecute the action.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.  Whether Defendants violated the Securities Act;

      b.  Whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

      c.  To what extent the members of the Class have sustained damages and the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this actions as a class action.

## **FIRST CAUSE OF ACTION**

**For Violation of § 11 of the Securities Act**
**Against All Defendants**

108.    Lead Plaintiffs repeat and re-allege each and every allegation contained above, as it fully set forth herein.

109.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

110.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein.

111.   Defendants are strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions.

112.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material facts, and were not misleading.

113.   By reason of the conduct herein alleged, each Defendant violated, or controlled a person who violated, § 11 of the Securities Act.

114.   Lead Plaintiffs acquired RLX ADS pursuant to the Registration Statement.

115.   Lead Plaintiffs and the Class have sustained damages.  The value of RLX ADS has declined substantially subsequent to and as a result of Defendants' violations.

116.   At the time of their purchases of RLX ADS, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.[32]  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based, to the time that this action commenced.  Less than three years have elapsed between the time that the securities upon with this Cause of Action is brought were offered to the public and the time this action commenced.

---

[32] *See supra* note 1.

## SECOND CAUSE OF ACTION

**For Violation of § 12(a)(2) of the Securities Act
Against All Defendants**

117.     Lead Plaintiffs repeat and re-allege each and every allegation contained above, as if set forth herein.

118.     This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77k on behalf of the Class, against all Defendants.

119.     By means of the defective prospectus, Defendants promoted, solicited, and sold RLX ADS to Lead Plaintiffs and the other members of the Class.

120.     The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Lead Plaintiffs, and other Class members, who purchased RLX ADS pursuant to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to the make the statements therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus, as set forth above.

121.     Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could Lead Plaintiffs have known, of the untruths and omissions contained in the prospectus at the time Lead Plaintiffs acquired RLX ADSs.[33]

122.     By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, Lead Plaintiffs and the other

---

[33] *See id.*

Class members who purchased RLX ADS pursuant to the prospectus, sustained substantial damages in connection with their purchases of the shares.  Accordingly, Lead Plaintiffs and other Class members who hold the ADS issued pursuant to the prospectus, have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADS to Defendants sued herein.  Class members who have sold their ADS seek damages to extent permitted by law.

### THIRD CAUSE OF ACTION

**For violations of § 15 of the Securities Act**
**Against All Defendants Except the Underwriter Defendants**

123.    Lead Plaintiffs repeat and re-allege each and every allegation contained above, as it fully set forth herein.

124.    This Cause of Action is brought pursuant to § 15 of the Securities Act against all Defendants, except the Underwriter Defendants.

125.    The Individual Defendants were controlling persons of RLX, within the meaning of the Securities Act.  By virtue of their positions as directors or senior officers of RLX or Cogency Global, as alleged above, these Defendants each had the power to influence, and exercised same, over the Company to cause it to engage in the conduct complained of herein.  The Company controlled the Individual Defendants and all of RLX's employees.  The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of RLX.  Likewise, Cogency Global controlled Defendant DeVries, who signed the Registration Statement at the direction of Cogency Global, in her capacity as an employee representative of Cogency Global.  RLX, the Individual Defendants and Cogency Global were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which

allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiffs as Class Representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand trial by jury

Dated: November 8, 2021                          Respectfully submitted,

/s/ Matthew M. Guiney
Matthew M. Guiney
Patrick Donovan
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Guiney@whafh.com
Donovan@whafh.com

*Co-Lead Counsel for Lead Plaintiffs and the*
*Class*

/s/ Thomas L. Laughlin, IV
Thomas L. Laughlin, IV
Rhiana L. Swartz
Jonathan M. Zimmerman
**SCOTT+SCOTT ATTORNEYS AT LAW**
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com
jzimmerman@scott-scott.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*