UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEX GARNETT, Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

-v-

RLX TECHNOLOGY INC., YING (KATE) WANG, LONG
(DAVID) JIANG, YILONG WEN, YUEDUO (RACHEL)
ZHANG, COLLEEN A. DEVRIES, COGENCY GLOBAL
INC., CITIGROUP GLOBAL MARKETS INC., and CHINA
RENAISSANCE SECURITIES (HONG KONG) LIMITED,

Defendants.

21 Civ. 5125 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this putative class action, plaintiffs bring strict liability claims under federal securities

law against China-based e-cigarette[1] company RLX Technology Inc. ("RLX"), certain RLX

officers and directors, the financial services companies that served as underwriters for RLX's

January 22, 2021 initial public offering ("IPO"), and RLX's United States representative

(collectively, "defendants"). They challenge a range of representations made in the prospectus

and registration statement that RLX issued in advance of its IPO. They primarily allege that

defendants failed to disclose the likelihood of forthcoming enhanced regulations of e-cigarettes

in China that would tend to harm RLX's financial prospects. Based on these alleged misleading

statements and omissions, plaintiffs, on behalf of all purchasers of RLX securities in connection

with its IPO, claim violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the

---

[1] This decision uses the terms "e-cigarettes," "e-cigarette products," and "e-vapor products" to
refer to the products also colloquially referred to, among other names, as "e-cigs," "vapes," and
"vape pens."

"Securities Act"), *codified at* 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. Pending now is a motion, brought by a subset of defendants (the "moving defendants"), to dismiss plaintiffs' Second Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants the motion and dismisses the complaint with prejudice.

I.    **Background**

RLX manufactures and sells e-cigarette products in the People's Republic of China ("China"). Dkt. 58 ("Second Amended Complaint" or "SAC") ¶ 21. On January 22, 2021, RLX conducted its IPO in New York City, securing gross proceeds of about $1.4 billion. *Id.* ¶¶ 3, 12, 67. Approximately two months later, on March 22, 2021, two Chinese government bodies posted, before the market's opening, draft regulations that proposed an amendment under which e-cigarettes would be subject to the same regulations as traditional tobacco products. *Id.* ¶¶ 14, 80. That day, the value of RLX's shares dropped to $10.15 per share, marking a 48% decrease from the closing value of $19.46 per share on March 19, 2021, the previous trading day. *Id.* at ¶ 14.

Lead plaintiffs are individual purchasers of RLX's American Depositary Shares ("ADS") "pursuant or traceable to" RLX's F-1 registration statement (required for foreign issuers of securities), amendments to that statement, and RLX's prospectus on Form 424B4 (together, the "Offering Materials"), each issued in connection with RLX's IPO. *Id.* ¶¶ 1, 20. They bring claims on behalf of all persons or entities who purchased or otherwise acquired RLX's shares pursuant to the Offering Materials and were damaged as a result. *Id.* at ¶ 1. As developed below, the SAC principally alleges that the Offering Materials made misrepresentations about, and/or omitted to reveal, plans by Chinese regulators to issue national regulations that would treat e-cigarettes akin to traditional tobacco products. *Id.* ¶¶ 4, 5, 14. These, the SAC alleges,

inhibited plaintiffs from adequately assessing the fair value of RLX's shares. *Id.* ¶ 9. Plaintiffs

bring claims against RLX, certain RLX officers and directors, the IPO's underwriters, and

RLX's U.S. representative. *Id.* ¶¶ 21–29, 108–25.

### A.    Factual Background[2]

1.    **September 2017–August 2020: Chinese Government Entities Issue Statements and Regulations Regarding E-Cigarettes Prior to RLX's IPO**

Since e-cigarettes and other "new tobacco" products were first introduced in the Chinese

market, the popularity of such products among Chinese consumers has grown "exponential[ly]."

*Id.* ¶ 32. RLX[3] purports to be the "No. 1 branded e-vapor company" in China—which RLX

terms its "largest potential market." *Id.* ¶ 3. According to a survey that predated RLX's IPO,[4]

RLX ranked first in brand awareness among e-vapor product users in China, with a mindshare of

---

[2] The facts are drawn from plaintiffs' Second Amended Complaint ("SAC"), Dkt. 58. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The Court also considers the documents attached to the SAC and to the declaration of Robert A. Fumerton in support of the motion to dismiss, Dkt. 61 (Decl. of Robert Fumerton ("Fumerton Decl.")), including RLX's registration statement and prospectus and various news articles. "It is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (alterations omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). "[D]istrict courts may 'permissibly consider documents other than the complaint' for the truth of their contents if they 'are attached to the complaint or incorporated in it by reference,'" and "[a] document that is integral to the complaint and partially quoted therein may be incorporated by reference in full." *Id.* at 352 n.3 (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

[3] RLX's parent company is Relx Inc.  SAC ¶ 21.

[4] The SAC states that the survey was conducted by the Chinese Investment Corporation. SAC ¶ 32. The Offering Materials state that the survey was conducted by China Insights Consultancy. Fumerton Decl. at Ex. B ("Offering Materials") at 6.

67.6% at the time of the survey. *Id.* ¶ 32. In advance of the IPO, RLX accounted for a large share of sales of closed-system e-vapor products, drawing 48% and 62.6% of retail sales of such products in 2019 and the first nine months of 2020, respectively. *Id.*

Two government bodies—the State Tobacco Monopoly Administration ("STMA") and the China National Tobacco Corporation ("CNTC")—regulate or otherwise guide China's tobacco industry, including its staff, finances, properties, products, supply, distribution, and domestic and foreign trade. *Id.* ¶ 33. The STMA is responsible for tobacco regulation. *Id.* The CNTC is a state-owned manufacturer of tobacco products operated by China's Ministry of Industry and Information Technology ("MIIT"). *Id.*

Before RLX's IPO, Chinese officials became "increasingly concerned" about the rise in popularity of e-cigarettes and other new tobacco products and "sought to bring e-cigarettes in line with traditional tobacco products from a regulatory perspective." *Id.* As detailed below, during the three years before the IPO, Chinese regulators took various actions to enhance the country's regulation of e-cigarettes, including prohibiting the sale of e-cigarettes to minors, urging the closure of e-cigarette sales on certain online channels, and issuing administrative replies and updates regarding the regulatory outlook for the e-cigarette industry. *See generally id.* ¶¶ 34–68.

    *a.  September 18, 2017 Reply to the National People's Congress*

On September 18, 2017, the STMA issued a reply to Proposal No. 4237 of the Fifth Session of the 12th National People's Congress, a Chinese legislative body, urging strengthening the supervision of new tobacco products such as e-cigarettes (the "September 2017 Reply"). *Id.* ¶ 34. The reply stated that the STMA "exercise[s] monopoly management on the production, sale, import and export of monopolized tobacco products on behalf of the state according to law" and "participate[s] in China's implementation of the Framework Convention on Tobacco

Control." *Id.* at Ex. B (certified English translation); *see also id.* ¶ 35. As to "incorporating Electronic cigarettes into the management of tobacco products," the STMA stated:

> In order to standardize the market order of new tobacco products such as Electronic cigarettes and safeguard consumers' rights and interests according to laws and regulations, we are actively studying and formulating a feasible scheme to strengthen the supervision of new tobacco products such as Electronic cigarettes, coordinating with legislative departments to formulate effective supervision policies and measures, and promoting the establishment and improvement of general technical standards, product launch rules and marketing rules for new tobacco products such as Electronic cigarettes. . . .
>
> In the future, we will strengthen the supervision of new tobacco products such as Electronic cigarettes within the scope of our authority and powers.

*Id.* at Ex. B (certified English translation); *see also id.* ¶ 35.

> b.      *August 28, 2018 Ban on E-Cigarette Sales to Minors*

On August 28, 2018, the STMA and State Administration for Market Regulation ("SAMR") issued a notice prohibiting RLX and all other market entities from selling e-cigarettes to minors (the "Minor Sales Ban").[5] *Id.* ¶ 38. Chinese regulators had previously banned the sale of traditional tobacco products to minors. *Id.*

On September 19, 2018, the Library of Congress published a post that summarized the ban. Dkt. 61 (Decl. of Robert Fumerton ("Fumerton Decl.")) at Ex. D. It stated that "China has not yet passed a comprehensive tobacco control law on the national level," and that "[t]he manufacture, sale, and use of e-cigarettes in China have largely been unregulated, despite the rapid growth of the country's e-cigarette industry and the rising popularity of e-cigarettes in recent years." *Id.* The post noted that "[b]efore the circular [concerning sales of e-cigarettes to minors] was issued, relevant government agencies appeared to be reluctant to take the lead in regulating e-cigarettes." *Id.*

---

[5] The SAC links to a Chinese-language web posting of the notice. SAC ¶ 38 n.4.

     *c.*    *October 16, 2018 Reply to the National People's Congress*

On October 16, 2018, the STMA issued another reply to the National People's Congress, this time to Proposal No. 6801 of the First Session of the 13th National People's Congress (the "October 2018 Reply"). SAC ¶ 40. As to the "management of new tobacco products as tobacco products," the STMA stated:

> We fully agree that heated cigarettes, Electronic cigarettes and other new tobacco products shall be managed as tobacco products.
>
> In respect of heated cigarettes. As its tobacco stick is mainly made of cut tobacco wrapped with cigarette paper and other auxiliary materials, it can produce smoke for smoking or sniffing after heating, which fully meets the basic criteria of traditional cigarettes. Therefore, it is essentially a cigarette stipulated in the Tobacco Monopoly Law and shall be managed as tobacco products. At present, we have provided clear supervision opinions on heated cigarettes in the market, and requires all law enforcement units to carry out market investigation and punishment of heated cigarettes in accordance with various supervision regulations of traditional cigarettes.
>
> In respect of Electronic cigarettes. We believe that although Electronic cigarettes containing nicotine is different from traditional cigarettes in appearance, it also takes nicotinamide as the main consumption component and leads to addiction and health risks. Therefore, we believe that Electronic cigarettes containing nicotine shall also be included in the supervision of tobacco products. As present, we are actively promoting the regulatory legislation of Electronic cigarettes containing nicotine and waiting for further instructions from relevant departments. In the next step, we will closely follow up the follow-up progress of Electronic cigarettes supervision legislation, hoping to promote the promulgation of relevant legislation or policies promptly and timely.

*Id.* at Ex. D (certified English translation); *see also id.* ¶ 40.

     *d.*    *Further Regulations of E-Cigarettes in 2019*

In the wake of the Minor Sales Ban and the STMA replies, other Chinese authorities "followed suit and began bringing regulatory treatment of e-cigarettes in line with other traditional tobacco products." *Id.* ¶ 43. For example, at the local level, on January 1, 2019, the municipal government of the city of Hangzhou implemented the Regulations of Hangzhou City on Smoking Control in Public Places, which included e-cigarettes "alongside" traditional tobacco

products in its ban on smoking in certain areas. *Id.* ¶ 44. Similarly, on June 26, 2019, the Shenzhen Municipal Government issued regulations that included e-cigarettes in tobacco control management. *Id.* ¶ 47.

At the national level, on January 22, 2019, the Civil Aviation Administration of China banned general tobacco and e-cigarettes in airplane cockpits. *Id.* ¶ 45. Similarly, on May 22, 2019, the State Council announced regulations that "make clear" that e-cigarette smoke can trigger smoke alarms in trains, with "Do Not Use E-cigarette" signs displayed and violators of the warning punished accordingly. *Id.* ¶ 46. A few months later, in July 2019, the director of China's Planning Division of the National Health Commission indicated that the National Health Commission planned to pass legislation to regulate e-cigarettes. *Id.* ¶ 50.

      *e.*     *RLX's Response to the Ban on E-Cigarette Sales to Minors*

RLX took steps to cooperate with the August 2018 ban on selling e-cigarettes to minors, including by printing a "Minors Are Not Allowed to Use" warning on its packaging and manual—steps that "signaled that RLX was already treating the State Tobacco Monopoly Administration as a primary regulator." *Id.* ¶ 39.

In February 2019, RLX implemented the "Guardian Program," a "further response to the directives of the State Tobacco Monopoly Administration." *Id.* ¶ 49; *see also id.* ¶ 48. A month later, in March 2019, defendant Ying (Kate) Wang—the founder, Chief Executive Officer ("CEO"), and chairperson of RLX's board of directors (the "Board") as of the IPO—stated that the Guardian Program stood "against the sale of cigarettes to minors" and "against the use of e-cigarettes in front of minors." *Id.* ¶ 49. Within a month, RLX applied the "Guardian Plan" to its products and channels. *Id.* ¶ 48. In August 2019, in further response to the STMA's directives, RLX launched a smart vending machine with face-scan recognition and age-check technology to prevent minors from buying e-cigarettes. *Id.* ¶ 51.

     *f.*    *September 29, 2019 Reply to the Chinese People's Political*
          *Consultative Conference*

On September 29, 2019, the STMA issued a reply (the "September 2019 Reply") to

Proposal No. 2991 of the Second Session of the 13th National Committee of the Chinese

People's Political Consultative Conference regarding "legislation to completely ban new

smoking products such as Electronic cigarettes." *Id.* at Ex. F (certified English translation); *see*

*also id.* ¶¶ 52–53. In the reply, the STMA stated:

> In recent years, new tobacco products such as Electronic cigarettes have shown a
> rapid development trend in the international market, and the number of
> manufacturers and consumers of new tobacco products such as Electronic cigarettes
> in China has also increased rapidly. At present, there are no specific supervision
> system and effective measures for Electronic cigarettes in China, and some
> problems need to be solved urgently in the Electronic cigarettes market. For
> example, the product is of uneven quality. It contains toxic and harmful
> ingredients, and induces consumers, especially minors, to become addicted to
> nicotine.

> We attaches great importance to and pays close attention to the market development
> of new tobacco products such as Electronic cigarettes, and begins to study the
> policies and measures of legal supervision and feasible supervision methods:

> First, we explicitly bring heated tobacco products into the scope of monopoly
> management . . . .

> Secondly, we strengthen the policy and legal research on Electronic cigarettes. At
> present, countries all over the world have accelerated the introduction of Electronic
> cigarettes regulatory policies. Generally speaking, the regulatory policies of
> various countries can be divided into prohibition, regulation as tobacco products,
> regulation as medical products, regulation as electronic products or ordinary
> consumer goods, etc. . . . At present, we are studying the regulatory ideas and main
> measures of new tobacco products such as Electronic cigarettes in major countries
> in the world, with a view to better implementing the regulatory requirements put
> forward by the Conference of the Parties to the Convention in the future.

> Thirdly, we issue the Notice on Prohibiting the Sale of Electronic cigarettes to
> Minors. . . . We require market participants not to sell Electronic cigarettes to
> minors, and all sectors of society jointly protect minors from Electronic
> cigarettes. . . .

> At present, the Regulations on Smoking Control in Public Places in Hangzhou and
> the revised Regulations on Smoking Control in Shenzhen Special Economic Zone

have brought Electronic cigarettes into the supervision scope of tobacco control in public places. We respect and support local tobacco control legislation to include e-cigarettes in the range of legislative regulation of tobacco control . . . .

In the next step, we will continue to communicate and coordinate closely with relevant departments, strengthen research and demonstration, and actively promote the introduction of control measures for new tobacco products such as Electronic cigarettes.

*Id.* at Ex. F (certified English translation).

        g.     *November 1, 2019 Notice Urging Closure of Online E-Cigarette Sales*

On November 1, 2019, the STMA and SAMR issued a notice "urg[ing]" e-cigarette manufacturers, sales companies, and individuals to close online e-cigarette sales channels and withdraw e-cigarette advertisements on the internet (the "Online Sales Notice").[6] *Id.* ¶ 56.

On November 1, 2019, *The New York Times* and *The Wall Street Journal* published articles regarding the Online Sales Notice. Fumerton Decl. at Exs. F, G. The *New York Times* article stated that the notice was China's "starkest warning yet over electronic cigarettes," and that "Chinese authorities, like their counterparts in the United States and elsewhere, have been rethinking addictions to vaping." *Id.* at Ex. F. It added that "[t]o some, the notice, was as clear as a room filled with smoke," and that "[t]he vaguely worded statement . . . left open questions about whether it qualified as a ban and whether it would be enforced." *Id.* The article quoted the head of the Electronic Cigarette Industry Committee of China, who said that "[t]here is no law and regulation in China that forbids the online sale of e-cigarette yet." *Id.* Relevant here, the article stated that RELX, "the most popular brand in China with 60 percent market share, said it

---

[6] The SAC provides a November 1, 2019 date for the notice regarding e-cigarette sales, SAC ¶ 56, while the Offering Materials provide an October 30, 2019 date for the notice, Offering Materials at 21. The SAC links to a Chinese-language web posting of the notice. SAC ¶ 56 n.17.

'firmly supports' the decision by the regulator," and had posted on social media that it would "fully act to terminate all sales and advertising on the internet." *Id.* As to the e-cigarette industry more broadly, the article stated that the business was "increasingly under siege everywhere." *Id.*

The *Wall Street Journal* article reported that the STMA and SAMR's notice characterized China's e-cigarette market as "unregulated." *Id.* at Ex. G. The article also stated that the STMA had "started drafting national standards for the vaping industry in October 2017," and that the standards were "still awaiting approval." *Id.*

In the wake of the regulatory announcement about online sales, RLX issued a statement that it supported the Online Sales Notice and made a corresponding update to its Guardian Program. SAC ¶ 58. On November 6, 2019, RLX terminated all self-operated online sales and closed its stores on e-commerce platforms. *Id.* ¶ 59. On December 1, 2019, RLX implemented the "Guardian Program" Management Penalty Regulations across all sales channels and established an independent inspection team to conduct random field inspections of RLX sales stores. *Id.* ¶ 60.

> h.    *Further Notices and Activity Related to the Ban on E-Cigarette Sales to Minors in 2019 and 2020*

In late 2019 and 2020, regulatory bodies took further actions related to e-cigarette usage among minors. On November 10, 2019, eight Chinese government bodies and committees—the National Health Commission, the Publicity Department of the Communist Party of China, the Ministry of Education, the National Radio Television Administration, the Central Committee of the Communist Youth League, the All China Women's Federation, the Statement Administration

for Market Regulation,[7] and the STMA—issued a notice aiming to strengthen publicity about the dangers of e-cigarettes and to censor smoking scenes in movies and television programs, in an effort to discourage young people from using e-cigarettes. *Id.* ¶ 57. On July 1, 2020, towards the same goal, the STMA and SAMR announced an inspection plan targeted at "further protect[ing] minors from e-cigarettes and prevent[ing] the e-cigarette market from resurgence." *Id.* ¶ 61. And on July 3, 2020, a standing committee issued a revised draft of the Laws on the Protection of Minors, which prohibited parents or guardians of minors from allowing or encouraging minors to smoke, including smoking e-cigarettes. *Id.* ¶ 62.

On July 17, 2020, RLX hosted a "Guarding Minor Remobilization Conference" on a live broadcast feed, encouraging offline stores to implement the notice further protecting minors from e-cigarettes and cooperate with the STMA and SAMR's inspection plan. *Id.* ¶ 63.

     *i.*    *August 2–6, 2020 STMA Director Statements on Tobacco Regulation*

About four months before RLX's IPO, the STMA's director conducted discussions about e-cigarette regulations with government officials. From August 2 through 4, 2020, the STMA's director discussed tobacco reform and development with officials from the Logistics Branch of Chongqing Tobacco Monopoly Administration, the Chongqing Cigarette Factory, and the Technological Center of China Tobacco Chongqing Industrial Co. Ltd., "emphasiz[ing]" in these conversations the "continuous strengthening of e-cigarette supervision with strict regulation of production and operations." *Id.* ¶ 64. From August 4 through 6, 2020, the STMA's director discussed tobacco reform and development with Tibetan officials during a visit to the Tobacco

---

[7] The SAC states that the "Statement Administration for Market Regulation" participated in issuing the notice. SAC ¶ 57. However, the web page linked in the SAC belongs to SAMR, the *State* Administration for Market Regulation, and a Google Chrome English translation of the web page states that SAMR was a participant in the notice. *See* SAC ¶ 57 n.18.

Monopoly Administration of Tibet Autonomous Region, addressing the need to conduct "in-depth special inspection actions on the e-cigarette market to strictly regulate business practices." *Id.* ¶ 65.

### 2.   January 2021: RLX Files Offering Materials in Connection with Its IPO

On October 26, 2020, RLX filed a confidential draft registration statement on Form F-1 in connection with its impending IPO in the United States. *Id.* ¶ 66. On January 19, 2021, RLX filed its final amendment to the registration statement, and, two days later, the Securities and Exchange Commission ("SEC") declared the registration statement effective. *Id.* ¶ 67.

On January 22, 2021, RLX filed its final prospectus for the IPO. *Id.* That day, RLX conducted its IPO in New York, issuing approximately 116.5 million ADS at an offering price of $12.00 per share and accruing gross proceeds of about $1.4 billion. *Id.* ¶¶ 12, 67. RLX's shares are listed on the New York Stock Exchange under the ticker symbol "RLX." *Id.* ¶ 3.

In the Offering Materials, RLX stated that it was the "No. 1 branded e-vapor company in China" and an "industry leader" in China's e-vapor market. Fumerton Decl. at Ex. B ("Offering Materials") at 89.[8] RLX stated that "we believe we can continue growing our revenue" and "expect to continue . . . benefiting from the rapid growth of China's e-vapor market." *Id.*

As to forward-looking statements in the Offering Materials, RLX stated that such statements in its prospectus were based "largely on our current expectations and projections about future events that we believe may affect our financial condition, results of operations, business strategy and financial needs." *Id.* at 69. In particular, the Offering Materials stated:

> These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our

---

[8] Citations to the Offering Materials in Fumerton Decl. at Ex. B refer to the page number at the bottom of the page, not to the page number of the exhibit as a whole.

actual results could be materially different from our expectations.  Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Prospectus Summary—Our Challenges," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," "Regulation" and other sections in this prospectus. . . .  We qualify all of our forward-looking statements by these cautionary statements.

*Id.*

The Offering Materials discussed current and potential future regulation of RLX's products in two sections: "Risk Factors" and "Regulation."

First, in the summary of "Risk Factors," the Offering Materials identified regulatory and policy changes as a risk factor to RLX's business.  They stated:  "Changes in existing laws, regulations and policies and the issuance of new laws, regulations, policies and any other entry barriers in relation to the e-vapor industry have materially and adversely affected and may further materially and adversely affect our business operations."  *Id.* at 5.  In the discussion of that particular risk factor, the Offering Materials stated:

As e-vapor products have become more and more popular in recent years, government authorities in China may impose more stringent laws, regulations and policies to regulate such products and the e-vapor industry.

Some countries have prohibited the usage of e-vapor products in certain areas or imposed specific taxes on e-vapor products.  In China, there are currently no clear and specific national laws, regulations, rules or standards for the sale of e-cigarettes, including e-vapor products, save for the announcements regarding prohibition on the sale of e-cigarettes to the underage as well as online advertisement and sale through the internet.  On August 28, 2018, the State Administration for Market Regulation and the State Tobacco Monopoly Administration jointly issued Announcement on Prohibition of Selling E-Cigarettes Products to the Underage, or the August 2018 Announcement, which specifically prohibits all sales of e-cigarettes to the underage.  On October 30, 2019, the State Administration for Market Regulation and the State Tobacco Monopoly Administration jointly issued the Announcement on Further Protecting the Underage from E-Cigarettes, or the October 2019 Announcement . . . .  The October 2019 Announcement urged (i) e-cigarette producers and sellers to shut down their online sales websites or online sales application programs and to withdraw the advertisements published on the internet; and (ii) e-commerce platform operators to close e-cigarette online shops and take e-cigarettes off shelves. . . .  [W]e took necessary measures to adjust our

business to follow the October 2019 Announcement, including but not limited to the ceasing of online operations and online marketing activities and rigorously implementing underage usage prevention initiatives. As a result of the October 2019 Announcement and our adjustment measures, revenues generated from sales to users through third-party e-commerce platforms and sales to third-party e-commerce platform distributors decreased significantly to nominal[.] . . . .

The August 2018 Announcement and the October 2019 Announcement, as well as any laws, regulations or governmental announcements that regulate the sale and use of e-cigarettes, may continue to adversely affect our business, growth and prospects. For example, the Notice of Maintaining Civil Aviation Order to Ensure Air Transportation Security promulgated by Civil Aviation Administration of China states that the usage of e-cigarettes would be treated as smoking and is therefore prohibited in aircrafts. In addition, some cities, such as Shenzhen, Hangzhou, Chengdu, Xi'an, Nanning and Chongqing, have banned the use of e-cigarettes in public places, which include, among others, public transportation and indoor workspace. Such prohibition may also affect the usage of our products, which may in turn adversely affect the sales of our products. Further, sales of e-cigarettes in China are also subject to relevant PRC laws and regulations that are generally applicable to the sales of goods, such as the PRC Civil Code and the Product Quality Law of the PRC. . . .

In addition, certain articles published on *Bulletin of the WHO* stated that governments should consider prohibiting the use of e-vapor products in indoor areas to protect non-users from involuntary exposure to second-hand aerosols, issuing warnings about the potential health risks of e-vapor products and imposing higher taxes on e-vapor products. Certain limitations may be imposed on the e-vapor industry, such as prohibition of usage in public spaces or imposition of additional tax, either of which may materially and adversely affect the development of the e-vapor industry.

*Id.* at 20–21; *see also* SAC ¶ 77.

The Offering Materials added:

We cannot assure you that government authorities will not impose further restrictions on e-vapor products in the future, including but not limited to requirements to obtain and maintain licenses, approvals or permits for relevant business operation. Such restrictions, if any, may adversely affect supplies of raw materials, production and sales activities, taxation or other aspects of our business operation. We may not be able to comply with any or all changes in existing laws and regulations or any new laws and regulations and may incur significant compliance cost. It is uncertain how government authorities in China will regulate e-vapor products or harm-reduction products in general and what additional regulations we may be subject to. All of the above may affect our production or market demand for e-vapor products, and thus adversely affect our business, financial condition and results of operations. As we continue to grow in scale and

significance, we expect to face increased scrutiny, which may result in increased investment in compliance and related capabilities.

Offering Materials at 21; *see also* SAC ¶ 77.

In the sections discussing other risk factors, the Offering Materials again referenced the Chinese regulatory environment. For example, they stated that "[t]he WHO recommended governments to strengthen relevant laws and regulations on the sale of e-vapor products, to, among others, prohibit marketing strategies targeting the underage and the non-smoking population." Offering Materials at 22. They also stated that "China's e-vapor market development is subject to the uncertainty of China's overall regulatory landscape for such products, which may have a material impact on the market development of China's e-vapor products," and that "[t]here can be no assurance that the regulatory regime will be favorable to e-vapor products in general and us." *Id.* at 23.

Second, in the "Regulation" section, the Offering Materials stated the following:

Currently, our e-vapor products are not specifically defined as "tobacco products" under the tobacco monopoly license system of the PRC, and thus our products are not under the administration of the tobacco monopoly system and do not violate relevant laws and regulations relating to tobacco monopoly. Except for the announcements prohibiting the sale of e-cigarettes, including e-vapor products, to juveniles and sale through the internet, as well as the smoking control rules of some cities regarding using e-cigarettes as a form of smoking, there are currently no laws and regulations which specifically govern the distribution of e-cigarettes in the PRC. We are therefore subject to general PRC business licensing requirements and its business operations are subject to laws and regulations that are generally applicable to electronic products, such as laws and regulations relating to product quality and consumer rights.

*Id.* at 140; *see also* SAC ¶ 69. As to the Tobacco Monopoly Law, the Offering Materials stated:

The Tobacco Monopoly Law of the PRC, or the Tobacco Monopoly Law, adopted by the Standing Committee of the National People's Congress on June 29, 1991 and last amended on April 24, 2015, and the Implementation Regulation of the Tobacco Monopoly Law issued by the State Council on July 3, 1997 and last amended on February 6, 2016, stipulated a tobacco monopoly license system for tobacco monopoly commodities. Pursuant to the Tobacco Monopoly Law and its Implementation Regulation, the state exercised monopoly administration in

15

> accordance with law over the production and sale of tobacco monopoly commodities; "tobacco monopoly commodities" refers to cigarettes, cigars, cut tobacco, redried leaf tobacco, leaf tobacco, cigarette paper, filter rods, cigarette tow and special tobacco machines. Cigarettes, cigars, cut tobacco and redried leaf tobacco are generally referred to as "tobacco products" under the Tobacco Monopoly Law. Our products are not currently defined as "tobacco products" in the Tobacco Monopoly Law and its Implementation Regulation.

Offering Materials at 141; *see also* SAC ¶ 70. The "Regulation" section also noted the August 2018 ban on e-cigarette sales to minors, the October 2019 notice urging the closure of online sales and advertising of e-cigarettes, and the issuance of smoking-control rules by many cities in China. Offering Materials at 141.

### 3. March 2021: Chinese Regulators Post Draft E-Cigarette Regulations After RLX's IPO

On March 22, 2021, two months after RLX's IPO, the MIIT and STMA posted a solicitation for public comment on the draft Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China (the "Draft Regulation"). SAC ¶¶ 14, 80. Under the Draft Regulation, e-cigarettes and other new tobacco products would be subject to the same regulations as imposed on cigarettes and traditional tobacco products. *Id.* ¶ 80. The posting of the Draft Regulation explained the amendment as follows:

> In order to strengthen the supervision of new tobacco products such as Electronic cigarettes, the Ministry of Industry and Information Technology and the State Tobacco Monopoly Bureau studied and drafted the Decision on Amending the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China (Draft for Soliciting Opinions), which is now open to the public for comments.

*Id.* at Ex. H (certified English translation). The posting included two annexes. Annex 1 contained the text of the draft decision to amend the implementation regulations of the Tobacco Monopoly Law to add Article 65, which stated: "New tobacco products such as Electronic cigarettes shall be implemented with reference to the relevant provisions on cigarettes in these

Regulations." *Id.*; *see also id.* ¶ 82.  Annex 2 included the explanation for the amendment contained in Annex 1, citing the intent to "implement the decision-making arrangements of the CPC Central Committee and the State Council, further strengthen the supervision of new tobacco products such as Electronic cigarettes, and safeguard the legitimate rights and interests of consumers." *Id.* at Ex. H (certified English translation).  Annex 2 stated the following:

> Since its promulgation on July 3, 1997, the Implementation Regulations of the Tobacco Monopoly Law of the People's Republic of China . . . has been revised twice in 2013 and 2016 . . . .  In recent years, there have been a series of new situations and problems in the market supervision of new tobacco products such as Electronic cigarettes, so it is necessary to revise and improve the Implementation Regulations.  On the basis of full investigation, evaluation and demonstration in the early stage, in consideration of the characteristics of electronic cigarette products and market development, and absorbing international regulatory experience, the Draft for Soliciting Comments was formed.

*Id.*  Annex 2 cited three "main considerations" related to the draft decision in Annex 1:

> (1) Promotion of the legalization of Electronic cigarettes supervision.  In recent years, there have been some new situations and problems in the market supervision of new tobacco products such as Electronic cigarettes, which are of great concern to the whole society.  This revision mainly intends to implement the requirements of the CPC Central Committee and the State Council on promoting the legalization of Electronic cigarettes supervision, clarify the legal basis for the supervision of new tobacco products such as Electronic cigarettes, and connect with the Law of the People's Republic of China on the Protection of Minors and other laws and regulations, so as to give full play to the important role of the rule of law in consolidating the governing foundation, stabilizing people's expectations and benefiting the long-term development.

> (2) Compliance with the characteristics of Electronic cigarettes products and the current international regulatory practices.  In view of the homogeneity between new tobacco products such as Electronic cigarettes and traditional cigarettes in core components, product functions and consumption patterns, new tobacco products such as Electronic cigarettes shall be implemented concerning the relevant provisions on cigarettes in the Implementation Regulations.  This is also consistent with the supervision methods of new tobacco products such as Electronic cigarettes in major countries and regions in the world.

> (3) Improvement of the supervision efficiency of Electronic cigarettes.  Implementing new tobacco products such as Electronic cigarettes with reference to the relevant provisions on cigarettes in the Implementation Regulations will greatly improve the supervision efficiency of Electronic cigarettes, effectively regulate the

> production and operation activities of Electronic cigarettes, solve the problems of
> product quality and safety risks and false advertisements in Electronic cigarettes,
> and effectively protect the legitimate rights and interests of consumers.

*Id.*; *see also id.* ¶ 83.

On March 22, 2021, the first trading day after the Draft Regulation was announced,

RLX's ADS closed at $10.15 per share, down nearly 48% from its close of $19.46 per share on

March 19, 2021, the previous trading day. *Id.* ¶ 84.

In an April 12, 2021 article, *Forbes* reported that the Draft Regulation, which "would

classify e-cigarettes as tobacco products and potentially bring them under the control of the state

monopoly, China Tobacco," could "cause RLX's hard-fought market share to evaporate if

authorities choose to regulate vapes in the same way as cigarettes, rather than ill-defined tech

devices." *Id.* ¶ 85 (emphasis omitted).  The article quoted a lawyer specializing in compliance

for tobacco and vaping companies, who stated that "[s]tricter regulation would decimate the

domestic e-cigarette market." *Id.*  The article stated that analysts outlined "a range of

[regulatory] outcomes, from a consumption tax—almost certain to happen and unlikely to have a

large impact on RLX's fortunes—to a state-controlled licensing and quota system, which is less

likely but would drastically reduce the scope of the company's market." *Id.* ¶ 86 (alteration in

original) (emphasis omitted).  The article also quoted an employee of defendant and RLX IPO

underwriter China Renaissance, who stated:  "In the traditional tobacco industry, cigarette sales

volume and prices are all set by China Tobacco[.]  If this is applied to e-cigarettes, then that will

remove all the value of the e-cigarette companies, but that is a very unlikely scenario."[9]  *Id.*

---

[9] The SAC quotes these two sentences in full, except for the last phrase of the second sentence:
"but that is a very unlikely scenario." SAC ¶ 86.  The SAC cites to the article in a footnote, *see*
SAC ¶ 85 n.31, and the facts here draw that phrase directly from the linked article. *See* Giacomo
Tognini, *How This Chinese Vaping Billionaire Became One of the World's Richest Women in*

The article also discussed RELX International, "a separate, privately-owned company with an opaque structure in which [RLX CEO] Wang is a director" and which the China Renaissance employee stated may have been separated from RLX "to maximize benefits and reduce risks." *Id.* ¶ 87. With respect to RELX International, the article reported: "If the Chinese market keeps growing, then [RLX] will be far more attractive to U.S. investors on its own rather than bundling it with the smaller international business, which makes up only 10% of overall sales. Conversely, if publicly traded RLX were to be shut out of China by the state monopoly, RELX International's 18 markets—including Russia, South Korea and the U.K.—would remain independent of the Chinese business." *Id.*

As of the filing of the SAC on November 9, 2021, RLX's ADS had not returned to their trading prices before the announcement of the Draft Regulation and were trading as low as $3.70 per share. *Id.* ¶ 15.

**B.    Procedural History**

On June 9, 2021, Alex Garnett filed this putative class action against RLX, certain officers and directors, the U.S. representative of RLX, and the financial services companies that served as underwriters for the IPO. Dkt. 1. On July 1, 2021, the Court adjourned the time for the served defendants to respond to the complaint until after the Court appointed lead plaintiffs. Dkt. 18. On August 4, 2021, Garnett filed the First Amended Complaint. Dkt. 21. On August 31, 2021, the Court appointed Chien-Lung Tseng, Billy Sung, and Jerry Yue as lead plaintiffs and Wolf Haldenstein Adler Freeman & Herz LLP and Scott+Scott Attorneys at Law LLP as co-lead counsel. Dkt. 52.

---

*Three Years*, Forbes (Apr. 12, 2021, 6:30 a.m.), https://www.forbes.com/sites/giacomotognini/2021/04/12/rlx-relx-chinese-vaping-billionaire-kate-wang-one-of-the-worlds-richest-women-in-three-years/?sh=57cc27ac71b4 (last visited Sept. 1, 2022).

On November 9, 2021, plaintiffs filed the instant complaint, the SAC.  Dkt. 58.  In addition to RLX, the SAC names three entity defendants: (1) Cogency Global Inc. ("Cogency"), which acted as RLX's designated U.S. representative for purposes of the IPO, as well as (2) Citigroup Global Markets Inc. ("Citigroup") and (3) China Renaissance Securities (Hong Kong) Limited ("China Renaissance"), both of which served as underwriters for the IPO and helped to draft and disseminate the Offering Materials.  SAC ¶¶ 28–29.  The SAC also names five individual defendants based on their roles in reviewing, contributing to, and signing and/or authorizing the signing of the Offering Materials: (1) Ying (Kate) Wang, co-founder, CEO, and chair of RLX's Board at the time of the IPO; (2) Long (David) Jiang, co-founder of RLX and a director on the Board at the time of the IPO; (3) Yilong Wen, co-founder of RLX and a director on the Board at the time of the IPO; (4) Yueduo (Rachel) Zhang, Head of Finance at RLX at the time of the IPO; and (5) Colleen A. DeVries,[10] Senior Vice President of Cogency.  *Id.* ¶¶ 22–27.  Plaintiffs assert violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, *codified at* 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  *Id.* ¶¶ 108–25.  They bring claims under Sections 11 and 12(a)(2) against all defendants and a claim under Section 15 against all defendants except Citigroup and China Renaissance.  *Id.* ¶¶ 108, 117, 123.

On December 23, 2021, RLX, Citigroup, China Renaissance, DeVries, and Cogency (the "moving defendants") filed the pending motion to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).[11]  Dkts. 59, 60 ("MTD").  On February 7, 2022, plaintiffs filed an

---

[10] The Court notes that the moving defendants' papers express the party's name as "Colleen A. De Vries."  For consistency with the SAC and the docket, this decision uses the spelling "Colleen A. DeVries."

[11] The motion states that, to the moving defendants' knowledge, the remaining individual defendants—Ying (Kate) Wang, Long (David) Jiang, Yilong Wen, and Yueduo (Rachel)

opposition.  Dkt. 62 ("Opp. to MTD").  On March 9, 2022, the moving defendants filed a reply. Dkt. 63 ("Reply").

## II.   Legal Standards

### A.   Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

### B.   Elements of Plaintiffs' Claims

The SAC asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

"Claims brought under §§ 11 and 12(a)(2) of the Securities Act involve 'roughly parallel elements,'" with Section 11 providing a basis for claims arising from an issuer's registration statement and Section 12(a)(2) providing a basis for claims arising from an issuer's prospectus. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

---

Zhang—have not been served.  MTD at 1.  The docket does not include any affidavits of service as to those defendants and indicates that none of those defendants have yet appeared.

Under Section 11, any person who acquired a security under a registration statement that either (1) "contained an untrue statement of a material fact" or (2) "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" may sue every person who, *inter alia*, signed the registration statement, served as a director or partner in the issuer, or acted as an underwriter with respect to the security.  15 U.S.C. § 77k(a). "Liability attaches to a security's issuer, its underwriter, and certain other statutorily enumerated parties pursuant to section 11 . . . if any part of the operative registration statements" contained such a misstatement or omission.  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013) (internal quotation marks and citation omitted).

Similarly, Section 12(a)(2) holds liable any person who offers or sells a security by means of a prospectus that either (1) "includes an untrue statement of a material fact" or (2) "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," provided that the seller "shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission."  15 U.S.C. § 77l(a)(2).  Notably, "[w]hereas the reach of Section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement."  *In re Morgan Stanley*, 592 F.3d at 359.  "An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities ['] owner.'"  *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647

(1988)).  Suits under both Section 11 and Section 12(a)(2) must be brought within one year after

the discovery of the untrue statement or omission.  15 U.S.C. § 77m.

"Significantly, a plaintiff bringing claims under these provisions need not plead scienter,

reliance, or causation."  *In re Qudian Inc. Sec. Litig.*, No. 17 Civ. 9741 (JMF), 2019 WL

4735376, at *5 (S.D.N.Y. Sept. 27, 2019); *see also Tongue*, 816 F.3d at 209.  "Issuers are subject

to 'virtually absolute' liability under section 11, while the remaining potential defendants under

sections 11 and 12(a)(2) may be held liable for mere negligence."  *In re Morgan Stanley*, 592

F.3d at 359 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  In addition,

where a plaintiff's claims do not sound in fraud, the plaintiff need not meet "the heightened

pleading standard of Rule 9(b)."[12]  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  "Thus,

in contrast to their catchall cousin in the Exchange Act—section 10(b), 15 U.S.C. § 77j(b)—

sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more

readily."  *In re Morgan Stanley*, 592 F.3d at 359–60 (internal quotation marks and citation

omitted).

---

[12] The Second Circuit has held that "while a plaintiff need allege no more than negligence to
proceed under Section 11 and Section 12(a)(2)," the heightened pleading standard of Rule 9(b)
nevertheless applies to Section 11 and Section 12(a)(2) claims where the claims are "premised on
allegations of fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). The determination
of whether claims are "premised on allegations of fraud" depends on the "terms of the conduct
alleged" and not whether the allegations are "styled or denominated as fraud or expressed in
terms of the constituent elements of a fraud cause of action." *Id.* Here, the SAC casts plaintiffs'
claims as "non-fraud, strict liability claims," SAC ¶ 2; *see also* Opp. to MTD at 6; the moving
defendants do not argue otherwise. Because the Court finds that the SAC fails even without
scrutiny under the heightened pleading standard of Rule 9(b), there is no reason to consider
whether the SAC's claims are in fact "premised on allegations of fraud," *Rombach*, 355 F.3d at
171.

Claims under Section 15 hinge on the success of claims under Sections 11 and 12(b)(2), as Section 15 provides for liability of any person who, by or through stock ownership, agency, or otherwise, "controls any person" found liable under Sections 11 or 12(a)(2). 15 U.S.C. § 77o.

### 1.   Material Misstatements or Omissions

"When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety." *In re Morgan Stanley*, 592 F.3d at 365–66. "[T]wo issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality." *Id.* at 360.

As to the existence of either a misstatement or unlawful omission, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'" *Id.* at 366 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102, 105 (reviewing offering materials holistically in analyzing alleged misstatements and omissions). "[A] prospectus will violate federal securities laws if it does not disclose material objective factual matters, or buries those matters beneath information, or treats them cavalierly." *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 103 (quoting *DeMaria*, 318 F.3d at 180). Still, while "the 'objective of a prospectus is to solicit investment by the general public' and 'the intended audience . . . encompasse[s] both sophisticated financial analysts and untutored lay persons,' the prospectuses are not 'required to address [reasonable investors] as if they were children in kindergarten.'" *Id.* at 102 (alterations in original) (quoting *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980)).

Indeed, federal securities law "do[es] not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (discussing claims under Section 10(b) and Rule 10b–5), and "[d]isclosure of an item of

information is not required . . . simply because it may be relevant or of interest to a reasonable investor," *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (discussing claims under Section 14(a) and Rule 14a–9). *See also In re Morgan Stanley*, 592 F.3d at 360–61 (analyzing claims of omissions under Sections 11 and 12(a)(2) based on whether defendants were required to disclose the allegedly omitted information). An omission is actionable only when disclosure of information is "necessary" to make the statements in the registration statement and/or prospectus "not misleading." 15 U.S.C. §§ 77k(a), 77l(a)(2). In other words, "when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *In re Morgan Stanley*, 592 F.3d at 366 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).

As to materiality, it is established "when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also In re Morgan Stanley*, 592 F.3d at 360 (definition of materiality is the same under Sections 11 and 12(a)(2) as it is under Section 10(b) of the Exchange Act). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder *might* consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). Moreover, "it is well established that an alleged misstatement does not qualify as material if the relevant facts are 'already in the mix of public information' at the time of an IPO." *In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6 (quoting *In re SunEdison Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 488 (S.D.N.Y. 2018)). Therefore,

the Second Circuit has held, "the materiality hurdle remains a meaningful pleading obstacle, and we will dismiss a section 11 claim where the alleged omission was 'so obviously unimportant to a reasonable investor' that reasonable minds would agree on that omission's unimportance." *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102 (quoting *In re Morgan Stanley*, 592 F.3d at 360).

Nevertheless, "because the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley*, 592 F.3d at 360 (quoting *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009)). As the Second Circuit has noted, "[w]here the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim [under Sections 11 and 12(a)(2)] is even lower" than the burden to allege the existence of an omission or misstatement. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).

### 2.   The "Bespeaks Caution" Doctrine for Forward-Looking Statements

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). "First, the [Private Securities Litigation Reform Act of 1995] creates a statutory 'safe harbor' for certain statements." *Id.* "Second, courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine." *Id.* Because "the safe harbor 'does not apply to statements made in connection with an initial public offering, such as an IPO prospectus,'" *id.* (quoting *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2017), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)), only the "bespeaks caution" doctrine can afford RLX relief in this case. *See also* 15 U.S.C. § 77z-2(b)(2)(D).

"The bespeaks-caution doctrine is a corollary of the well-established principle that a statement or omission must be considered in context." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob.,*

*Ltd.*, 620 F.3d 137, 141 (2d. Cir. 2010) (internal quotation marks and citation omitted).  Under

the doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is

not actionable because no reasonable investor could have found the statement materially

misleading." *Id.*; *see also In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *5 (quoting

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  "In such circumstances,

it cannot be supposed by a reasonable investor that the future is settled, or unattended by

contingency." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141.  "To apply [the doctrine], however,

the cautionary language must pertain to the specific risk that was realized." *Gregory*, 297 F.

Supp. 3d at 398.  "'[C]autionary language [that] did not expressly warn of or did not directly

relate to the risk that brought about plaintiffs' loss' is insufficient." *Id.* (quoting *Halperin*, 295

F.3d at 359).  Furthermore, "[c]autionary words about future risk cannot insulate from liability

the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173.

### 3.    Item 105 and Item 5(D) of Form 20-F

The SAC also alleges violations of RLX's disclosure obligations under Item 105, 17

C.F.R. § 229.105, and Item 303, *id.* § 229.303, of SEC Regulation S–K.  SAC ¶¶ 10–11.

Plaintiffs have since clarified that the SAC mistakenly styled their claim as based on Item 303,

rather than on Item 5(D) of Form 20-F for foreign issuers.  Opp. to MTD at 13 n.8.  Nonetheless,

as plaintiffs note, their arguments under Item 303 apply to claims under Item 5(D).  *See id.*;

*Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. Mar. 17, 2021)

(recognizing that, "[s]trictly speaking, Item 303 does not apply to foreign corporations," but that

"the SEC has stated that its interpretations of Item 303 apply to Management Discussion &

Analysis [MD&A] disclosures drafted pursuant to Item 5 of Form 20-F, which does apply to

foreign corporations" (internal quotation marks omitted)); *see also Shetty v. Trivago N.V.*, 796 F.

App'x 31, 33 & n.4 (2d Cir. 2019) (analyzing Section 11 claim of alleged violation of Item 303

involving a Form F-1 statement for foreign private issuers).  The failure to disclose information required under Items 105 and 303 can serve as the basis of claims under Section 11.  *See, e.g., Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 Civ. 9848 (PGG), 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020).

Item 105 requires that offering documents provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and discourages "[t]he presentation of risks that could apply generically to any registrant or any offering."  17 C.F.R. § 229.105(a).  "To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." *Wandel v. Gao*, No. 20 Civ. 3259 (PAC), 2022 WL 768975, at *11 (S.D.N.Y. Mar. 14, 2022). "When the omitted information concerns a contingent or speculative event, 'the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 554 (S.D.N.Y. 2021) (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001)).

As relevant here, Item 303 compels disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii). Likewise, Item 5(D) of Form 20-F requires that registrants "discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported

financial information not necessarily to be indicative of future operating results or financial condition."[13]

Under Item 303, plaintiffs must allege that "a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Litwin*, 634 F.3d at 716; *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 Civ. 10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010). "[G]eneric cautionary language" that is "spread out over several different filings" and "often unconnected to the [defendant's] financial position" does not satisfy Item 303. *Stratte-McClure*, 776 F.3d at 105 (quoting *Panther Partners*, 681 F.3d at 122) (holding that plaintiffs adequately alleged violation of disclosure duty under Item 303 where "market watchers, including [the defendant's] analysts, reported a downward trend in the real estate and subprime mortgage markets" prior to the class period, and defendant "had significant exposure to a sharp downturn in the subprime market," *id.* at 104, but dismissing for failure to plead scienter).

## III. Discussion

In moving to dismiss the SAC for failure to state a claim, the moving defendants mainly argue that its allegations of material misstatements and omissions fail because (1) the Chinese draft regulations treating e-cigarettes as traditional tobacco products had not been proposed or enacted "until months after [RLX's] IPO"; (2) information about the Chinese regulators' deliberative processes "was equally accessible to Defendants and investors alike"; and (3) the Offering Materials "warned of the precise risk that later materialized," including the adoption of

---

[13] *Form 20-F*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/files/form20-f.pdf (last accessed Sept. 4, 2022).

new regulations that would harm RLX's financial performance.   MTD at 2.   Separately, they

argue that plaintiffs lack standing to assert a Section 12(a)(2) claim because they do not allege

that they bought their shares in the IPO rather than in a secondary market. *Id.*

For the following reasons, the Court grants the motion to dismiss in full, with prejudice.

**A.    Claims Under Sections 11 and 12(a)(2)**

The SAC alleges that the Offering Materials contained two sets of material misstatements

and omissions.  These concerned: (1) the prospect that RLX's products would come to be

regulated in China under the standards governing traditional tobacco products, and the status of

draft regulations to that effect, *see, e.g.,* SAC ¶¶ 4–7, 71–72, 75–76, 78, 88, and (2) the effect of

such future regulations on RLX's financial prospects, *see id.* ¶¶ 69, 79.[14]  On a similar basis, the

SAC alleges that RLX violated its disclosure duties under both Item 105, by failing to disclose

the "imminent" adoption of regulations treating e-cigarettes on par with traditional tobacco

products and the correspondingly heightened risks presented by an investment in RLX; and Item

303 (through its foreign-issuer analog, Item 5(D)), by failing to disclose the "known" regulatory

trend of aligning e-cigarette and traditional tobacco regulations and the potentially negative

effect of such a development on RLX's net sales. *Id.* ¶¶ 10–11, 73–74; Opp. to MTD at 13 n.8.

Below, the Court addresses each set of alleged misstatements in turn, beginning with the

SAC's central allegation that RLX inadequately disclosed the prospect of future regulation of e-

---

[14] The SAC also faults the Offering Materials for not reporting the existence of RELX
International.  SAC ¶ 88.  But it does not explain the basis of a duty to disclose the existence of
this affiliate, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360–61 (2d Cir. 2010),
or, assuming such a duty, why this non-disclosure was material.

cigarettes. For the reasons that follow, the Court holds that the SAC has not plausibly alleged a misstatement or omission actionable under Section 11 or Section 12(a)(2).[15]

1.  **Statements Regarding the Prospect of Regulations Subjecting E-Cigarettes to the Regulations Imposed on Traditional Tobacco Products**

The SAC's core allegation is that the Offering Materials misrepresented and omitted to disclose that, "at the time of the IPO, as part of an ongoing regulatory initiative, Chinese regulatory entities were already crafting national standards for e-cigarettes that would bring them into line with regular cigarette regulations," and that "these same regulatory entities had repeatedly disclosed that the regulations were certain to be enacted." SAC ¶ 4; *see also id.* ¶ 7; Opp. to MTD at 8–13 (citing cases). It faults the Offering Materials for omitting to disclose the STMA's replies in September 2017 and October 2018 to the National People's Congress and its reply in September 2019 to the National Committee of the Chinese People's Political Consultative Conference. These, the SAC alleges, "confirm that, at the time of the IPO, the [STMA] was actively preparing to regulate e-vapor products and that treatment of these products as tobacco products was a *fait accompli.*" SAC ¶ 71; *see also id.* ¶¶ 36–37, 41–42, 54–55.

On this basis, the SAC alleges, the Offering Materials were actionable in multiple respects. They put forth a "false and misleading narrative that RLX was not facing imminent

---

[15] Derivative of its claims against RLX and its officers and directors, the SAC brings claims against underwriter defendants Citigroup and China Renaissance, seeking to hold them liable for the misstatements and omissions in the Offering Materials, on the ground that the underwriters knew or should have known of these deficiencies but nonetheless caused the actionable Offering Materials to be filed. SAC ¶ 31; *see also id.* ¶ 98 (underwriter defendants "failed to conduct a reasonable due diligence investigation with regard to RLX's IPO"). The moving defendants counter that the SAC's allegations as to the underwriters are "generic" and do not allege any specific action by any underwriter before the IPO. MTD at 19. Because the Court finds that the SAC does not plausibly allege an actionable misstatement or omission so as to support liability under Sections 11 or 12(a)(2), its claims against the underwriters necessarily fail, too. There is thus no occasion to separately address the claims about the underwriters' diligence.

regulatory changes," which failed to "accurately reflect the regulatory environment in which RLX was operating in at the time of the IPO, where the [STMA] had already stated that it '*will*' and '*shall*' regulate e-cigarettes as tobacco products." *Id.* ¶¶ 76, 78.  They misleadingly "distinguish[ed] e-vapor products from traditional tobacco." *Id.* ¶ 72; *see also* ¶ 70.  They "painted existing regulatory efforts as discrete and limited in scope, rather than harbingers for the forthcoming national standard being actively prepared by the [STMA] at the behest and with the support of governmental officials." *Id.* ¶ 75.  And they misleadingly professed "unaware[ness] of how government authorities in China planned to regulate e-vapor products, if at all," *id.* ¶ 76, only "passively warning that the imposition of 'more stringent' laws and regulations *may* follow," *id.* ¶ 78.  *See also* Opp. to MTD at 11 (arguing that Offering Materials' statements regarding the prospect of future regulation were "generic").  Plaintiffs argue, too, that the Offering Materials' use of the word "may," as compared to words such as "shall," "will," and "likely," to describe the prospect of future regulatory action did not adequately disclose the likelihood of regulations. *See, e.g.*, *id.* at 5, 12, 14.

For multiple reasons, the SAC does not state a claim as to the allegations of this nature. First, and principally, as reviewed below, the Offering Materials, "taken together and in context," *In re Morgan Stanley*, 592 F.3d at 366 (quoting *DeMaria*, 318 F.3d at 180), did not misleadingly state or omit facts related to the prospect of more stringent regulation of e-cigarettes in China. Second, even if the SAC had plausibly alleged a misstatement or omission along these lines—which it does not—such would concern facts "'already in the mix of public information' at the time of an IPO," *In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6 (quoting *In re SunEdison Inc. Sec. Litig.*, 300 F. Supp. 3d at 488), and, accordingly, would not qualify as material. Third, in light of RLX's cautionary language about the prospect of future enhanced regulation of e-

cigarettes, the "bespeaks caution" doctrine protects the statements at issue, which would not have left any reasonable investor with the impression that, as to enhanced regulation of e-cigarettes in China, "the future [was] settled, or unattended by contingency," *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141.

### a.    Existence of a Misleading Statement or Omission

First and foremost, the SAC does not plausibly plead a misleading statement or omission because the Offering Materials adequately disclosed the possibility of stricter regulations—indeed, the possible outright prohibition—of e-cigarettes in China.

To this end, the Offering Materials explicitly noted, as a risk factor, that "[c]hanges in existing laws, regulations and policies and the issuance of new laws, regulations, [and] policies . . . have materially and adversely affected and may further materially and adversely affect our business operations." Offering Materials at 5.  They noted the possibility that "government authorities in China may impose more stringent laws, regulations and policies to regulate [e-vapor] products and the e-vapor industry." *Id.* at 20.  They cited strict regulatory measures taken by other countries with respect to e-cigarettes.  These, they noted, included the imposition of taxes on e-cigarette sales and the outright prohibition of e-cigarettes.

The Offering Materials also recited the local, administrative, and national regulatory measures that Chinese authorities had already put in place with respect to e-cigarettes as of the time of the IPO.  At the national level, these included the Minor Sales Ban and the Online Sales Notice. *Id.* at 21.  At the local and administrative level, these included regulatory measures such as the ban on e-cigarette usage on aircrafts and city-level bans in Shenzhen, Hangzhou, Chengdu, Xi'an, Nanning, and Chongqing on the use of e-cigarettes in public places. *Id.*  Further, the Offering Materials alerted investors to the facts and contours of China's existing national-level

regulations on tobacco products, while noting that these "[c]urrently" do not apply to e-cigarettes. *Id.* at 140; *see also id.* at 141.

The Offering Materials also noted regulatory guidance from the World Health Organization (WHO). Such guidance, they stated, "may" prompt the "prohibition of usage in public spaces or imposition of additional tax, either of which may materially and adversely affect the development of the e-vapor industry." *Id.* at 21.

More broadly, the Offering Materials stated that "China's e-vapor market development is subject to the uncertainty of China's overall regulatory landscape for such products, which may have a material impact on the market development of China's e-vapor products." *Id.* at 23. Thus, they warned, "[t]here can be no assurance that the regulatory regime will be favorable to e-vapor products in general and us." *Id.* As to the economic consequences of potential enhanced regulation, the Offering Materials noted that, upon RLX's compliance with the notice urging the termination of certain online sales, RLX's revenues from such sales had "decreased significantly to nominal." *Id.* at 21.

Viewed as a whole, these statements in the Offering Materials fairly alerted investors to the existing regulatory strictures in China governing e-cigarettes, the prospect that heightened regulation of these products would be undertaken, and the attendant risks to investors. These warnings, which went so far as to warn of the possible future prohibition upon e-cigarette sales, were sufficient to pick up the regulatory risk that later materialized: that China would decide to calibrate regulation of e-cigarettes to track its regulation of tobacco products. *Cf. In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *7 (dismissing allegation of misleading representation of regulatory compliance where defendant company's offering materials stated that the regulatory framework was "evolving" and "inconsistent[]" and warned that its business practices could be

found to violate Chinese laws, with adverse effects on the company); *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1296 (S.D. Fla. 2021) (dismissing claims of misstatements and omissions as to possibility of future, unfavorable regulations of e-cigarettes where defendant company's offering materials included cautionary language regarding the risk of such regulations, along with the potential adverse effects of regulatory developments on its business).

The SAC alleges that RLX should have gone further: to disclose, effectively, that it was *inevitable* that Chinese authorities would subject e-cigarettes to China's tobacco control regime. They also fault RLX for not explicitly citing the three STMA replies, insofar as these replies ostensibly "confirm[ed]," SAC ¶ 71, that regulatory legislation along these lines would assuredly be adopted. But, conclusory statements aside, the SAC does not allege facts that made the adoption of such laws a foregone conclusion. Quite the contrary, the excerpts of the 2017, 2018, and 2019 replies quoted by the SAC—although not models of linguistic clarity—make apparent that they were describing, in broad terms, ideas then under consideration and that they were preliminary and precatory. The September 2017 Reply, for example, stated that "we are actively studying and formulating a feasible scheme to strengthen the supervision of new tobacco products such as Electronic cigarettes," and that "[i]n the future, we will strengthen the supervision of new tobacco products such as Electronic cigarettes within the scope of our authority and powers." *Id.* at Ex. B. And the September 2019 Reply stated that the STMA had "beg[u]n[] to study the policies and measures of legal supervision and feasible supervision methods," and "[a]t present" was "studying the regulatory ideas and main measures of new tobacco products such as Electronic cigarettes in major countries in the world, with a view to better implementing" regulatory requirements. *Id.* at Ex. F. Neither document announced a firm intention to align the regulation of e-cigarettes with that of tobacco. And the SAC does not

allege other facts that made the adoption of such regulations a foregone conclusion.  Thus, even accepting as true all well-pled factual allegations and drawing all reasonable inferences in plaintiffs' favor, *see Steginsky*, 741 F.3d at 368, the SAC fails to plausibly plead the necessary premise to its claims: that, at the time of the IPO, *any* market player could be certain that China would "imminent[ly]," SAC ¶ 73, adopt regulations treating e-cigarettes as traditional tobacco products.

To be sure, as the SAC notes, the middle of the STMA's replies—from October 2018— contains a statement of the STMA's position that it "fully agree[d] that . . . Electronic cigarettes . . . shall be managed as tobacco products" and "believe[d] that Electronic cigarettes . . . shall also be included in the supervision of tobacco products."  *Id.* at Ex. D.  But this statement appeared in the context of the statement that the STMA, while "actively promoting the regulatory legislation of Electronic cigarettes containing nicotine," was "waiting for further instructions from relevant departments," *id.*  And the STMA's statement a year later continued to describe a process of study and consultation, stating that the body was "begin[ning] to study the policies and measures of legal supervision and feasible supervision methods" for e-cigarettes, *id.* at Ex. F.  Reinforcing the iterative quality of the regulatory process, the September 2019 Reply stated that "there are no specific supervision system and effective measures for Electronic cigarettes in China," that it "respect[ed] and support[ed] local tobacco control legislation to include e-cigarettes," and that it was studying "regulatory ideas" from different countries, including "prohibition, regulation as tobacco products, regulation as medical products, regulation as electronic products or ordinary consumer goods, etc."  *Id.*  Vitally, the September 2019 Reply—the latest word from the STMA, at least as included in the SAC, and the closest in time to the January 2021 IPO—did *not* state that e-cigarettes would be regulated as traditional tobacco

products.  It declared only that the STMA would "continue to communicate and coordinate closely with relevant departments, . . . and actively promote the introduction of control measures for new tobacco products such as Electronic cigarettes." *Id.*  Taken together, these replies fairly indicated an inclination within the STMA towards heightened regulation, but left unclear the timing and form of such regulations—or whether, within the Chinese national government, the STMA's preferred course would even carry the day.

The other regulatory pronouncements cited in the SAC also fall well short of plausibly supporting the SAC's claim that the treatment of e-cigarettes as traditional tobacco products was a "*fait accompli,*" *id.* ¶ 71.  They did not speak explicitly to that point.  The Minor Sales Ban prohibited e-cigarettes for only one segment of the population. *Id.* ¶ 38.  And the municipal and administrative regulations of e-cigarettes adopted in some cities and on airplanes and trains, *id.* ¶¶ 43–47, suggested a general trend toward increased government regulation of the e-cigarette industry, but these did not support the proposition that national regulations equating e-cigarettes to traditional tobacco products were certain.

Finally, that China had taken other regulatory actions in this space did not assure this particular legal outcome.  China had prohibited the sale to minors of both traditional tobacco products and e-cigarettes, *id.* ¶ 38, and aspects of some local and administrative regulations of the two categories of products were coterminous, *id.* ¶¶ 43–47.  But these distinct steps did not assure that e-cigarettes would certainly be regulated as traditional tobacco products; on the contrary, the coexistence of the existing laws and regulations alongside China's generally laxer national treatment of e-cigarettes could be equally taken to suggest a lack of will to regulate e-cigarettes to the same degree.  Similarly, the November 1, 2019 Online Sales Notice, *id.* ¶ 56, although urging the e-cigarette industry to curb online sales, did not itself prohibit such sales, let

alone more broadly align the legal regimes attributable to e-cigarettes and tobacco. And the various notices from regulatory bodies, *id.* ¶ 57, inspection plans from the STMA and SAMR, *id.* ¶¶ 61–62, and remarks from the STMA's director, *id.* ¶¶ 64–65, did not preordain the enactment of such laws, either.

In the end, drawing all reasonable inferences in plaintiffs' favor, the SAC's factual allegations depict an environment in which the regulation of e-cigarettes in China had gradually tightened and could well continue over time to tighten. But these allegations do not plausibly support the central fact that the SAC claims the Offering Materials failed to disclose: that laws that put regulation of e-cigarettes on par with tobacco products were inevitable—"imminent" and "a *fait accompli.*" *Id.* ¶¶ 71, 76. Accordingly, the SAC's claim that RLX should have disclosed the inevitability of regulations treating e-cigarettes as traditional tobacco products fails.[16] And, as detailed above, with that claim put aside, the Offering Materials were above legal reproach. They disclosed and in detail—without material omission or misrepresentation—both the existing regulatory environment with respect to e-cigarettes and the possibility that "government authorities in China may impose more stringent laws, regulations and policies to regulate [e-vapor] products and the e-vapor industry." Offering Materials at 20. No more disclosure about

---

[16] In light of this analysis, the SAC's attempt to fault RLX for using the word "may"—rather than a stronger term such as "shall," "will," or "likely"—to describe the possibility that more stringent laws or regulations of this nature might be adopted, *see, e.g.,* SAC ¶ 78; Opp. to MTD at 5, also fails. And far from actionably downplaying the prospect of enhanced regulation of some sort, the Offering Materials clearly outlined the trend toward greater regulation of RLX's products. Their use of the word "may" did not make them misleading. *Cf. In re ProShares Tr. Sec. Litig.*, 728 F.3d at 103–04 (rejecting linguistic argument that a registration statement's use of the phrase "diverge significantly" to describe the relationship between a security's long-term value and that of its underlying index failed to encompass the possibility of actual losses, based on (1) the "context of the prospectus as a whole" and (2) the plain meaning of the phrase as used in the offering materials).

potential regulatory developments was required.  As the Second Circuit has put the point:
"Companies subject to government regulation are not required to speculate or foresee coming
regulation or its potential effect on the company."  *Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d
431 (2d Cir. 1999).[17]

     To the extent the SAC can be read to make the related claim that the Offering Materials
should have specifically cited the STMA replies, the SAC does not plead facts on which RLX
had a duty to make that specific disclosure.  An omission is actionable only when disclosure of
information is required or such disclosure is otherwise "necessary" to make the statements in the
registration statement and/or prospectus "not misleading."  15 U.S.C. §§ 77k(a), 77l(a)(2).  Here,
the Offering Materials fairly presented the uncertain regulatory landscape, the unfavorable
regulatory actions that had been taken in China and elsewhere, and the prospect of stricter
regulation in China of e-cigarettes.  There was no freestanding duty to cite the STMA replies
specifically.  And doing so was not necessary to make RLX's account of the regulatory
environment non-misleading.  Plaintiffs note the fact that RLX had complied with the Minor
Sales Ban as evidence that RLX viewed the STMA as a "primary regulator," SAC ¶ 39; *see also*
Opp. to MTD at 10 n.4.  But RLX's compliance with the STMA's regulations—to which it
explicitly referred in the Offering Materials—did not oblige it to disclose *all* communications
from the STMA.  Where factual particulars are not necessary to make an overall disclosure non-

---

[17] Relatedly off-base is plaintiffs' suggestion that "[t]he market's reaction" to the announcement
of the Draft Regulation reveals that RLX "failed to disclose all of the facts necessary to make the
Offering Documents not materially misleading."  Opp. to MTD at 1; *see also id.* at 11 n.5.  The
market's reaction does not support that RLX knew as of the date of the Offering Materials that
regulations of this nature were inevitable.  Quite the contrary: insofar as RLX is not alleged to
have had inside knowledge of the plans of Chinese regulators, to the extent the stock's price drop
reflects that the market did not anticipate the Draft Regulation, it is all the more plausible that
RLX did not do so either.

misleading, an issuer need not disclose them "simply because [they] may be relevant or of interest to a reasonable investor," *Resnik*, 303 F.3d at 154.

This case is thus afield from two lines of Section 11 and 12(a)(2) precedents in which courts have found actionable claims of insufficient disclosures. In one, the issuer did not disclose "specific information" about material existing business risks. *E.g.*, *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 830–31 (S.D.N.Y. 2017) (sustaining claims where game-publishing platform company "provided only generalized disclosures that described the risk of delayed launch" even though it had "specific information" about the delayed launch of a popular game); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 511, 516 (S.D.N.Y. 2013) (sustaining claims where social network company used "generalized and indefinite terms" in offering materials to describe a "trend [the defendant] knew was affecting its business revenues"). Here, in contrast, insofar as the STMA's replies and other communications by Chinese regulators did not make new regulations imminent or inevitable but merely a possibility, RLX did not have a duty to disclose more than that possibility. In the other, an issuer failed to disclose its *known* violations of *existing* foreign law or regulatory investigations into such violations. *See, e.g., Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (reinstating as plausibly pled securities law claims where solar product manufacturer failed to disclose "existing problems" at its plants that gave rise to violations of Chinese regulations); *Panther Partners*, 2020 WL 5757628, at *16 (sustaining claims that issuer "concealed the business risks presented by then-existing violations of then-existing regulations" in China, and instead disclosed only, and in hypothetical terms, the potential violation of such regulations); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 441 (S.D.N.Y. 2009) (same, where defendants failed to disclose active or past investigation by a regulatory body); *see also*

*Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23–24 (2d Cir. 2017) (reinstating Section 10(b) and Rule 10b–5 claims where company "concealed the fact that, . . . two months prior to the IPO, high level officials of China's 'powerful' State Administration for Industry and Commerce . . . summoned [defendant] to an administrative guidance meeting" and warned the defendant of potential repeating fines); *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 206–07 (S.D.N.Y. 2016) (sustaining claims under Section 10(b) and Rule 10b–5 where defendants described their business as compliant with regulatory best practices, despite fact that "UK authorities had recently announced their intention to scrutinize industry players for compliance with published guidelines" and defendant's "alleged operating practices fell far short of those guidelines"); *BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 324 (S.D.N.Y. 2016) (same, where defendants failed to disclose existing violations of Chilean environmental obligations and previous fines for their non-compliance).

More closely on point is *In re Qudian Inc. Securities Litigation.* Plaintiffs there claimed violations of Sections 11, 12(a)(2), and 15, including, relevant here, on the ground that a China-based loan company had "misleadingly represented" its compliance with Chinese interest-rate regulations. 2019 WL 4735376, at *7. Dismissing that claim, the district court noted that the issuer's offering materials had "stated—in several places—that the regulatory framework for the consumer finance market was 'evolving,' could 'remain uncertain,' and was generally 'still at a nascent stage and subject to further change and interpretation,'" and had also "warn[ed], in bold and italics, that if [its] business practices were 'deemed to violate any [Chinese] laws or regulations, [its] business, financial condition, results of operations and prospects would be materially and adversely affected,' and reiterated that the applicable regulatory scheme was 'ambiguous' and could be 'applied inconsistently.'" *Id.* (quoting registration statement). Here,

RLX's Offering Materials similarly disclosed—at some length—both that the regulatory outlook for e-cigarettes was "uncertain" and that new laws or regulations could impose on it a "significant compliance cost."  Offering Materials at 21.

Apposite too—and involving strikingly similar factual allegations—is *In re Greenlane Holdings, Inc. Securities Litigation*, which dismissed a Section 11 claim against an e-cigarette company that sells products in the United States and Canada.  511 F. Supp. 3d at 1289.  Plaintiffs there alleged that the company had made false and misleading statements in its registration statement in part on the ground that its IPO offering papers failed to disclose two proposed ordinances that would limit the sale of e-cigarettes in San Francisco.  *Id.* at 1295.  As is alleged here, the later enactment of the ordinances—two months after the IPO—was followed by a "precipitous[]" drop in the company's stock price.  *Id.* at 1293.  The district court held the plaintiffs' claims deficient on two grounds.  First, the undisclosed information regarding the proposed ordinances was not material, in light of cautionary language in the offering materials about the risk of unfavorable regulations, the fact that the ordinances had not yet been enacted as of the IPO, and the fact that the proposed ordinances, "which [had been] announced at a press conference, were very much in the public domain."  *Id.* at 1296.  Second, the company did not have a duty to disclose the proposed ordinances, because it had "*expressly* disclosed" its reliance on a supplier subject to regulation and warned that regulatory developments could have a "material" and "adverse" effect on its business."  *Id.* at 1310 (internal quotation marks omitted).  To be sure, *Greenlane* is fairly distinguished on at least two grounds.  The SAC here complains about the inadequate disclosure of nationwide regulation of e-cigarettes in RLX's largest market, not merely in one municipality.  And, information about the ordinances proposed in San Francisco would be more readily discoverable to a U.S. investor than would information about

potential regulations in China.  Nevertheless, *Greenlane*'s central logic—that the issuer did not have a duty to disclose proposed but not enacted e-cigarette ordinances where it disclosed the trend towards more restrictive such regulations, *id.* at 1288—is persuasive here, particularly given RLX's capacious disclosures of existing Chinese regulation of e-cigarettes and the prospect of and trends towards more.

For those reasons, the SAC does not plausibly plead that RLX made any misleading statement or omission regarding the prospect of further regulations of e-cigarettes in China.

> b.      *Materiality of Alleged Misstatements or Omissions*

Even assuming that the SAC alleged misleading statements and omissions, it would not state Section 11 or 12(a)(2) claims for two reasons: (1) the information that RLX did not disclose was already within the public domain and thus there was no material nondisclosure; and (2) RLX's cautionary statements about the prospect of future e-cigarette regulations in China protects it under the "bespeaks caution" doctrine.

As to whether the prospect that e-cigarettes might come to be regulated in China alongside traditional tobacco products was available to the investing public and hence immaterial, the case law "does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718.  Context matters.  As the Second Circuit has explained, "'sporadic news reports . . . should not be considered part of the total mix of information that would clarify or place in proper context . . . representations' that were contained in materials that the company provided 'directly.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)).  But, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for

failing to disclose this information." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377

(E.D.N.Y. 2003) (dismissing securities fraud complaint where defendant disclosed it was subject

to a particular regulation and information about that regulation was a "matter[] of public

record"); *see also In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y.

2005) ("[T]he securities laws do not require disclosure of information that is publicly known.").

And, "where information is equally available to both parties, a defendant should not be held

liable to the plaintiff under the securities laws for failure to disclose." *Bettis v. Aixtron SE*, No.

16 Civ. 0025 (CM), 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) (quoting *Seibert v.

Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)).

Measured against these standards, the allegedly nondisclosed information contained in

the STMA replies and other announcements by Chinese authorities was, to a considerable extent,

"already in the mix of public information at the time of [the] IPO," and thus "does not qualify as

material," *In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6 (internal quotation marks and

citation omitted).  Statements by Chinese government authorities regarding their regulatory

aspirations as to e-cigarettes were, by nature, *public* information.  They were not information

"uniquely within [d]efendants' control." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d

232, 255 (S.D.N.Y. 2019); *see also In re Greenlane*, 511 F. Supp. 3d at 1304 ("[W]hen the

omitted facts are *not* uniquely within the defendant's control or when they are widely

circulated[,] the public availability of the information *can* weigh against materiality.").  And the

SAC notably does not allege that RLX or any individual defendant had any enhanced or special

access to Chinese government pronouncements or any information unavailable to the public.

The SAC counters that, in practice, information regarding Chinese authorities'

"regulatory and governmental declarations [related to e-cigarettes] . . . [were] not reasonably

available to the typical U.S. investor," who would have to "overcome multiple impediments to access this information," including locating the information online, bypassing firewall protections triggered by the lack of security encryption on the websites containing the information, and obtaining a certified English translation. SAC ¶ 14 n.1; *see also* Opp. to MTD at 21–22. There is force to these points, to the extent the Chinese government pronouncements at issue were obscure. But the moving defendants attach, to their motion to dismiss, separate English-language articles in *The New York Times* and *The Wall Street Journal*, each published before the IPO. These discussed the Online Sales Notice. And they revealed, to varying degrees, the state of e-cigarette regulations in China.[18] *See* Fumerton Decl. at Ex. F (*New York Times* article of November 1, 2019, calling the notice, albeit "vaguely worded," China's "starkest warning yet over electronic cigarettes"; stating that "Chinese authorities, like their counterparts in the United States and elsewhere, have been rethinking addictions to vaping"; and characterizing the e-cigarette industry as "a business increasingly under siege everywhere"); *id.* at Ex. G (*Wall Street Journal* article of November 1, 2019, stating that the STMA had "started drafting national standards for the vaping industry" and that the standards were "still awaiting approval"); *see also id.* at Ex. D (Library of Congress post of September 19, 2018, discussing the state of e-cigarette regulations in China; and stating that "relevant government agencies appeared

---

[18] Plaintiffs argue that these articles, which the SAC did not cite, are not cognizable on a motion to dismiss. Opp. to MTD at 22 n.16. But the Court may properly take judicial notice of "the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents," so long as it relies on such documents "only for the fact that the statement was made." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 352 (in considering claim that company misled the market as to a certain experiment metric, taking judicial notice of investment analyst reports for the fact that analysts relying on public information correctly predicted that metric). Here, the Court considers the two articles only for the fact that these sources publicly disclosed the Chinese regulatory actions related to e-cigarettes.

to be reluctant to take the lead in regulating e-cigarettes" before the Minor Sales Ban).  To be sure, these articles did not disclose the particulars of the pre-IPO pronouncements by Chinese regulators, including that one course under consideration would be to align e-cigarettes with tobacco.  But they absolutely captured the broader point that intensified national-level regulation of such products might be nigh.  And they put a member of the public with an interest in investing in RLX on clear notice that tightened regulations were under active consideration and worth investigating before investing.[19]  *Cf. In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) (where "[r]easonable investors . . . had ready access to the very information that the plaintiffs assert should have been disclosed," then "the defendants are not liable for failing to reiterate that information").

This case is thus in sync with others in this District finding information regarding the regulatory actions of foreign governments to have been "publicly known" to investors in the United States where the information was equally available to investors and the defendant issuer, even if not necessarily widely circulated.  *See, e.g., In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6 (where issuer was subject to Chinese regulations, finding alleged misrepresentations about activity in contravention to a regulatory ban "inactionable as a matter of law" where the nondisclosed information was available in "several newspaper articles"); *Barilli*, 389 F. Supp. 3d at 255 (where company was subject to Japanese regulations, finding no duty to disclose information about Japanese energy regulations, where the company's offering materials and

---

[19] The SAC itself cites an English-language news article published in April 2021 in the global business magazine *Forbes* that detailed Chinese authorities' March 22, 2021 solicitation for public comment on the draft regulations subjecting e-cigarettes to traditional tobacco regulations. *See* SAC ¶¶ 85–87.  Although the *Forbes* article is a further indicator that U.S. investors had pre-enactment access to the public pronouncements in China leading to the eventual regulations, it does not specifically assist the moving defendants here, because it post-dated RLX's IPO.

news articles, though "in highly specialized or Asian publications," "provide[d] the context of

the legal and regulatory developments in Japan, were published in the English language, and

were equally available to both [the defendant company] and Plaintiffs"); *Bettis*, 2016 WL

7468194, at *13 (where company was subject to Chinese government subsidies and taxes,

finding that allegedly omitted information was equally available to the investing public even

where the information "was not reported in as widely distributed publications as *The New York

Times* or the *Wall Street Journal*" but instead appeared in two "industry and region-specific

publications"). And, given the prominence of these publications, this case is also distinct from

cases finding reporting on undisclosed facts too "sporadic," or too subject to language barriers,

as to situate outside the public domain the information undisclosed by the issuer. *See, e.g.*, *N.J.

Carpenters*, 709 F.3d at 127 (news articles did not make alleged misstatements immaterial,

where these were "sporadic news reports" that "d[id] not alone clarify or contextualize the

alleged misstatements" and did not actually disclose the information alleged by plaintiff (internal

quotation marks and citation omitted)); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 438

(rejecting argument that publication of information in three Chinese-language newspaper articles

excused defendant from duty to disclose information). The public reporting on the regulatory

outlook for China's e-cigarette industry suggests that information about the Chinese

government's looming intensified regulation of e-cigarettes was "readily accessible in the public

domain," *Keyspan Corp.*, 383 F. Supp. 2d at 377. Because investors were "as free and as able to

read," *Bettis*, 2016 WL 7468194, at *13, these reports as RLX was, any omissions of such

information are thus unactionable.

On the facts here, the related "bespeaks caution" doctrine also protects RLX, given the

Offering Materials' multiple cautionary statements about future Chinese regulation of e-

cigarettes. These included: (1) "China may impose more stringent laws, regulations and policies to regulate . . . the e-vapor industry," Offering Materials at 20; (2) "[c]ertain limitations may be imposed on the e-vapor industry, such as prohibition of usage in public spaces or imposition of additional tax," *id.* at 21; (3) RLX "cannot assure you that government authorities will not impose further restrictions on e-vapor products," *id.*; (4) it was "uncertain how government authorities in China will regulate e-vapor products," *id.*; (5) "China's e-vapor market development is subject to the uncertainty of China's overall regulatory landscape for such products," *id.* at 23; and (6) "[t]here can be no assurance that the regulatory regime will be favorable to e-vapor products in general and us," *id.*  These cautionary statements repeatedly "warn[ed] of the specific contingency that lies at the heart of the alleged misrepresentation," *Gregory, P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).  To the extent the SAC faults RLX's forward-looking statements about potential e-cigarette regulations in China as insufficiently specific about the contours of potential future regulation, these warnings made such statements unactionable.  *See, e.g., id.* at 97–98 (upholding dismissal of Section 12 claim regarding representations of future financing where defendant's "language sufficiently caution[ed] prospective investors that future financing was tenuous"); *Halperin*, 295 F.3d at 359–60 (offering materials adequately warned of the risk that stocks may not be registered where the materials "explicitly warned of this risk" and mentioned potential registration with "hortatory language . . . surrounded by warnings that registration cannot be assured"); *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 763 (2d Cir. 1991).  As the Second Circuit stated: "In such circumstances, it [could not] be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141.  Accordingly, "no reasonable investor could have found the statement[s]

materially misleading," *id.*, and the SAC's claim of misleading statements and omissions fails for this additional reason.

### 2.    Statements Regarding the Impact of E-Cigarette Regulations on RLX's Financial Condition

Although a secondary focus of the SAC relative to its core claim that the prospect of enhanced Chinese regulation was inadequately disclosed, the SAC also alleges that the Offering Materials misrepresented the impact of future e-cigarette regulations on RLX's financial condition. It alleges that RLX "presented financial information to support [its] claim that 'RLX [w]as the industry leader,' and that its then-existing financial condition (and future prospects) were bright." SAC ¶ 79 (quoting Offering Materials). In fact, the SAC alleges, "the Company's financials were inaccurate," and "because regulators in China were already actively preparing a national standard for e-cigarettes, which would regulate them as traditional tobacco products and, thus, upend the Company's business, RLX's financials were not indicative of RLX's future financial performance." *Id.* Thus, plaintiffs contend, RLX failed to sufficiently disclose the "gravity of the risk" of e-cigarette regulations on RLX's business. Opp. to MTD at 9 n.3.[20]

These allegations do not make out a plausible claim of a Section 11 or 12(a)(2) violation. The SAC's allegations that RLX's financial prospects were misleadingly presented turn on the same premise considered above: that, as of the IPO, it was a "foregone conclusion" that Chinese authorities would imminently pass regulations subjecting e-cigarette products to the same regulatory framework applicable to traditional tobacco products. *Id.* at 19. But, for the reasons above, the SAC has not plausibly pled the certainty of such regulations as of the IPO. It follows

---

[20] The moving defendants argue that plaintiffs waived their claim that RLX's financial condition was misleadingly presented, by not mentioning it in their opposition brief. Reply at 3 n.2. The SAC, however, squarely makes this claim, and plaintiffs' opposition does advert, albeit briefly, to the potential impact of the allegedly undisclosed potential Chinese regulation on the "value" of e-cigarette companies, *see* Opp. to MTD at 9 n.3. The Court thus considers this claim.

that the claim—derivative of this allegation—that RLX's financials were "inaccurate" for failing to identify and discuss this particular threat to RLX's profitability, SAC ¶ 79, is also unactionable.

To the extent that the SAC relatedly faults RLX for presenting an unduly optimistic view of its financial outlook given the prospect of heightened regulation, that theory fails, too. As the Second Circuit has repeatedly held, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. "Up to a point, companies must be permitted to operate with a hopeful outlook." *Id.* And RLX warned of the risk that the SAC contends was undisclosed. The Offering Materials broadly warned that risk factors including regulatory changes "could cause our actual results to be materially different from our expectations." Offering Materials at 69. They also, at several points, specifically noted the possibility that current and future e-cigarette regulations could materially hurt RLX's financial condition. They noted, for example, that compliance with the Online Sales Notice had "significantly" decreased RLX's revenue from certain channels, and that the Minor Sales Ban, Online Sales Notice, and other administrative and local regulations could "continue to adversely affect [RLX's] business, growth and prospects." *Id.* at 21. They also stated that the regulatory future for e-cigarette products was "uncertain," outlined a range of potential regulatory measures including licensing requirements, heightened taxation, and bans on public smoking, and that such "may adversely affect supplies of raw materials, production and sales activities, taxation or other aspects of our business operation" and drive "significant compliance cost." *Id.*; *see also id.* (stating that regulatory changes "may affect our production or market demand" and "adversely affect our business, financial condition and results of operations").

In sum, even drawing all reasonable inferences in favor of the SAC, the Court does not

find any actionable statement or omission in the Offering Materials insofar as these discuss

RLX's financial prospects. Nor did RLX, in discussing the possible impact on these prospects of

further regulation, fail to "disclose material objective factual matters, or bur[y] those matters

beneath information, or treat[] them cavalierly," *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 103

(quoting *DeMaria*, 318 F.3d at 180). Rather, the assembled representations in the Offering

Materials, "taken together and in context," *In re Morgan Stanley*, 592 F.3d at 366 (internal

quotation marks and citation omitted), fairly alerted potential investors that the regulatory

outlook for RLX's e-cigarette business in China was uncertain and carried risks to profitability,

such that no reasonable investor could have concluded that RLX's future financial condition was

"unattended by contingency," *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141; *cf. Barilli*, 389 F.

Supp. 3d at 257 (issuer's characterizations of profitability of projects in Japan not misleading

where it included "cautionary language" that "its growth could be negatively affected by the

price of solar power components and engineering services and the price of and market demand

for solar power").

### 3. Alleged Violations of Duties Under Item 105 and Item 5(D) of Form 20-F

The SAC's claim that RLX violated its disclosure duties under Items 105 and 5(D) rests

on the same allegations reviewed above: that RLX failed to disclose the purported certainty that

regulations subjecting e-cigarette products to the regulations for traditional tobacco products

would be enacted. As to Item 105, the SAC alleges that RLX was obliged to disclose the

"imminent alignment of e-cigarettes and other new tobacco products with traditional tobacco

from a regulatory perspective," as such would have an "adverse material effect on RLX" and

rendered an investment in RLX "speculative" and "risky." SAC ¶ 73; *see also* Opp. to MTD at

13–16. As to Item 5(D), the SAC alleges that RLX was obliged to disclose this forthcoming "alignment" because it would materially and unfavorably impact RLX's financial condition. SAC ¶ 74; *see also* Opp. to MTD at 13–16.

These arguments are largely redundant of the claims of alleged misstatements and omissions that the Court has rejected above. The Court accordingly finds that the SAC has not alleged violations of RLX's duties under Items 105 and 5(D). *See Schaffer v. Horizon Pharma PLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (dismissing claims of violations under Items 303 and 503 where these were "largely redundant" of deficient claims under the Exchange Act and the Securities Act). As discussed above, the SAC does not plausibly plead that the regulatory alignment of tobacco and e-cigarettes was imminent or certain prior to the IPO such that RLX had a duty to disclose such an alignment. *Cf. Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (rejecting as "conclusory and insufficient" allegations of violations under Items 105 and 303 where plaintiffs alleged that defendant could be "presumed to have known" of a risk given its status as a "major participant" in the market (quoting plaintiffs' brief)); *Schaffer*, 2018 WL 481883, at *14 (dismissing claim of violation under Item 303 where plaintiffs "fail[ed] to identify any adverse economic event or trend that occurred *prior to* the Offering that was not disclosed in the Offering Documents" and did not plead, "with any specificity, facts establishing that [d]efendants possessed any actual knowledge of the purported 'trend' or event" (emphasis added)). And RLX adequately disclosed the present regulations of e-cigarettes in China, the adverse impact of the Online Sales Notice on RLX's financial condition, the uncertain regulatory outlook as to e-cigarettes, and the risk that "China may impose more stringent laws, regulations and policies to regulate such products and the e-vapor industry," Offering Materials at 20, noting the potential that such could have a

52

"material impact on the market development of China's e-vapor products," *id.* at 23. As to Item

105, the Offering Materials thus identified and reviewed "material factors" related to regulatory

prospects "that ma[d]e an investment in [RLX] . . . speculative or risky," 17 C.F.R. § 229.105(a).

And, as to Item 5(D), the Offering Materials disclosed the "known trends" and "uncertainties"

surrounding China's regulation of e-cigarettes, and the potential that future regulations could

have a "material effect on the company's net sales or revenues," *see* Item 5(D).

Item 105 and Item 5(D) required nothing further. Apposite here, the Second Circuit

affirmed the dismissal of a similar Item 303 claim that an issuer "fail[ed] to adequately warn

prospective shareholders of the evolving regulatory regime in Hawaii," where the registration

statement contained "repeated warnings that its business was generally vulnerable to changing

regulations, and particularly so in Hawaii," and stated that "changes in regulatory limitations,

particularly in concentrated markets such as Hawaii, could hinder the company's growth."

*Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 34, 39 (2d Cir. 2017). Other rulings in cases of

alleged failures to disclose regulation-related risks and trends are in accord. *See, e.g.*, *In re*

*Greenlane*, 511 F. Supp. 3d at 1313–14 (e-cigarette company did not breach duties under Item

303 where it did not disclose proposed e-cigarette ordinances, given company's "detailed

disclosures" of regulatory risks); *Lau*, 527 F. Supp. 3d at 556 (rejecting claim that company

violated Item 105 in not disclosing risks of fintech business, given its disclosure of "the risks of

its entry into the fintech market in its Prospectus . . . based on new and evolving regulatory

regimes, as well as other risks associated with its entry into the fintech market" (internal

quotation marks omitted)); *Barilli*, 389 F. Supp. 3d at 257–58 (dismissing claim of violation of

Item 303 based on alleged failure to disclose state of Japanese energy regulations, where "the

Prospectus, as well as media reports in the public domain, described the regulatory changes

underway in the Japanese market" and defendant stated that future measures "might affect [its] pipeline projects").[21]

Accordingly, the Court dismisses the SAC's claims under Sections 11 and 12(a)(2).

###    4.    Standing to Bring Section 12(a)(2) Claim

The moving defendants separately argue that plaintiffs lack standing to pursue their Section 12(a)(2) claim because the SAC does not allege that they purchased their shares directly in the IPO. MTD at 24–25. They also argue that the Court should dismiss the Section 12(a)(2) claims against defendants DeVries and Cogency because neither was a "statutory seller."[22] *Id.* at 25 n.13. Plaintiffs counter that, to establish standing, they are not obliged to identify the defendant from whom they purchased their shares, but only that they purchased shares in connection with the IPO. Opp. to MTD at 23–24. They also argue that the defendants are "statutory sellers"—RLX as an issuer, and the remaining defendants as entities that "successfully solicited" ADS purchases and signed the Offering Materials. *Id.* at 24–25.

In the interest of completeness, the Court addresses these arguments, notwithstanding its determination that the Section 12(a)(2) claims do not state a claim. The Court holds, with the

---

[21] This case is distinct from those finding well-pled violations—for example, where a complaint adequately alleged that China had "*already adopted* a regulatory framework . . . requir[ing] licensing" and other measures, and the defendant entities "were not in compliance with [these]." *Panther Partners*, 2020 WL 5757628, at *12–13 (emphasis added) (finding violations of Sections 11 and 12(a)(2) based on, *inter alia*, disclosure obligations under Items 105 and 303); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 511–14 (S.D.N.Y. 2013) (finding violation of Item 303 duties where defendant company "knew of the certainty of the trends," *id.* at 511, at issue yet failed to disclose the trend).

[22] The moving defendants also argue that the Section 11 claim against defendant DeVries should be dismissed because she did not personally sign, in her individual capacity, the registration statement. MTD at 25 n.13. As the Court dismisses the Section 11 claim on the merits, the Court need not, and will not, consider this argument.

moving defendants, that because the SAC does not allege that the plaintiffs purchased their

shares directly in the IPO, they lack standing to bring these claims.[23]

"In order to have standing under § 12(a)(2), . . . plaintiffs must have purchased securities

directly from the defendants." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013).

Plaintiffs who purchased securities in a secondary market or aftermarket lack standing.[24] *See,*

*e.g.*, *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007); *Yi Xiang v.*

*Inovalon Holdings, Inc.*, 327 F.R.D. 510, 520 (S.D.N.Y. 2018); *In re Fuwei Films*, 634 F. Supp.

2d at 445; *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 323 (S.D.N.Y. 2013).

As a result, "[c]ourts within this district have been appropriately wary of allegations that a

plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply

'pursuant to an offering,' because it is ambiguous whether the plaintiff is alleging they were a

direct or indirect purchaser." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 745 (S.D.N.Y.

2015) (citing cases).

RLX conducted its IPO on January 22, 2021, offering shares at the price of $12.00 per

ADS.  SAC ¶¶ 3, 67.  The SAC lacks specific allegations with respect to when and from whom

---

[23] The Court can properly reach defendants' Rule 12(b)(6) challenges notwithstanding its finding
of a lack of standing, because the standing deficiency here concerns statutory, not Article III,
standing.  *See, e.g.*, *4FS Fam., Inc. v. Lifchitz*, No. 21-903-CV, 2021 WL 5441264, at *3 n.4 (2d
Cir. Nov. 22, 2021) (distinguishing Article III standing from Section 12(a)(2) statutory standing,
which the Court can assume for purposes of Rule 12(b)(6)); *In re Bear Stearns Mortg. Pass-
Through Certificates Litig.*, 851 F. Supp. 2d 746, 776–79 (S.D.N.Y. 2012) (discussing Article III
standing and Section 12(a)(2) statutory standing separately).

[24] The Second Circuit has held that "nothing in the [Private Securities Litigation Reform Act]
indicates that district courts must choose a lead plaintiff with standing to sue on every available
cause of action," and that "[i]t is inevitable that, in some cases, the lead plaintiff will not have
standing to sue on every claim." *Police & Fire Ret. Sys. of the City of Detroit v. IndyMac MBS,
Inc.*, 721 F.3d 95, 112 (2d Cir. 2013) (internal quotation marks and citation omitted).  But "there
must be a named plaintiff sufficient to establish jurisdiction over each claim advanced." *Id.*

lead plaintiffs purchased their shares, stating only that they "purchased RLX's ADS pursuant and traceable to the Registration Statement and the IPO." *Id.* ¶ 20. Yet, according to their certifications, none of the lead plaintiffs purchased their shares at the $12.00 price, and two purchased their shares after the IPO. *See* Dkt. 23-2 (Chien-Lung Tseng: January 28, 2021, at $23.19 per share); Dkt. 40-3 (Billy Sung: January 25, 2021, at $26.50 per share); *id.* (Jerry Yue: January 22, 2021, at $29.51 per share). Accordingly, the certifications indicate that the lead plaintiffs did not buy their shares directly from RLX and thus lack standing to pursue Section 12(a)(2) claims. *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 304 (S.D.N.Y. 2021) (lead plaintiffs lacked standing under Section 12(a)(2) where they did not purchase securities on the day of the IPO and purchased shares at a price different than the price that defendant sold the shares); *In re Fuwei Films*, 634 F. Supp. 2d at 445 (dismissing Section 12(a)(2) claim brought by plaintiff on behalf of purchasers of shares in the aftermarket); *Yi Xiang*, 327 F.R.D. at 520 (dismissing Section 12(a)(2) claim brought by plaintiff who did not purchase any securities directly in defendant's IPO).

The moving defendants' second argument—that DeVries and Cogency did not qualify as "statutory sellers"—does not, however, supply an additional basis for dismissal. "Section 12(a)(2) requires proof that the defendant is a 'statutory seller' within the meaning of the Securities Act." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 139 (2d Cir. 2017). "Judicial precedent has settled that an entity is a statutory seller if it '(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve [its] own financial interests or those of the securities' owner.'" *Id.* (quoting *In re Morgan Stanley*, 592 F.3d at 359 (alterations in original)) (noting that Securities Act is "ambiguous" as to

the definition of "statutory seller," and holding that depositors constitute "statutory sellers").
"The Second Circuit has yet to define the activities that constitute successful solicitation, but it
has advised that an individual must have done more than engage in activities that were
preliminary to the offering." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224,
259 (S.D.N.Y. 2020) (internal quotation marks and citation omitted) (citing cases).  In particular,
"[a] pleading must allege that a defendant did more than merely sign a registration statement or
prospectus to allege liability under Section 12(a)(2)." *Id.* at 245 (finding insufficient basis to
conclude that defendant entity that did not directly market securities constituted a statutory seller
simply because it signed the registration statement).

The SAC alleges that DeVries "reviewed, contributed to, and signed the Registration
Statement," SAC ¶ 26, and "solicited the investing public to purchase [RLX] securities . . ., hired
and assisted the underwriters, [and] planned and contributed to the IPO and the Registration
Statement, all motivated by [her] own and the Company's financial interests." *id.* ¶ 27.  And it
alleges that Cogency is DeVries's employer. *Id.* ¶ 28.  Although summary, these allegations
suggest that DeVries did "more than engage in activities that were preliminary to the offering."
*In re Weight Watchers*, 504 F. Supp. 3d at 259.  Thus, at the pleading stage, the Court cannot
conclude that DeVries—and by extension, her employer—are incapable of being held liable
under Section 12(a)(2) on the ground that they were not statutory sellers. *Cf., e.g., City of
Omaha Police & Fire Ret. Sys.*, 450 F. Supp. 3d at 404 (underwriters constituted "statutory
sellers" where they "participated in the promotion and sale of . . . stock," "collected 'lucrative
underwriting fees' for their roles in the IPO," and "drafted and disseminated the Offering
Materials" (quoting complaint)).

**B.     Claim Under Section 15**

"[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *In re Morgan Stanley*, 592 F.3d at 358. Here, because the SAC does not allege viable claims of a "primary violation" of securities law under Sections 11 and 12(a)(2), its claim of control person liability under Section 15 necessarily fails, too. *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d at 305 (dismissing Section 15 control person liability claim where the Court did not find primary violation of securities law). The Court thus dismisses the SAC's claim under Section 15.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss the Second Amended Complaint.[25] The dismissal is with prejudice.[26] The Court respectfully directs the Clerk of Court to close the motions pending at docket numbers 59 and 64, and to close this case.

---

[25] Because the identified deficiencies in the SAC equally apply to the claims against those defendants—Ying (Kate) Wang, Long (David) Jiang, Yilong Wen, and Yueduo (Rachel) Zhang—who have not been served, the Court dismisses the complaint with respect to both the moving defendants and the non-served defendants.

[26] Plaintiffs have amended their complaint twice, *see* Dkts. 1, 21, 58, each time while represented by a common law firm, Scott+Scott Attorneys at Law LLP, which the Court has appointed a co-lead counsel. Dkt. 52. And plaintiffs have not sought leave to amend their complaint in the event of a dismissal. *See* Opp. to MTD. Further, given the basis for the Rule 12(b)(6) dismissal—that the SAC does not allege that changes in Chinese law had been adopted or were inevitable as of the date of the IPO—there is no basis to assume that additional investigation or diligence would rectify these deficiencies. It is, accordingly, proper to dismiss with prejudice. *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (upholding dismissal of complaint with prejudice given "the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result"; "no court can be said to have erred in failing to grant a request that was not made"); *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 662 F.3d 600, 603 (2d Cir. 2011) (no abuse of discretion in dismissal of complaint with prejudice where plaintiff sought leave to amend "only in the final sentence of her opposition to the motion to dismiss" and did not advance new factual allegations that she would make in amended complaint on appeal).

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 30, 2022
      New York, New York